[No. 43253. En Banc. September 25, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID T. SMITH, *Appellant*.

*Lanning, Mahoney & Bryan,* by *Robert S. Bryan,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* by *Michael P. Ruark, Senior Deputy,* for respondent.

HAMILTON, J.—Appellant was convicted by a jury of murder in the first degree. He seeks a new trial on grounds that a tape recording was improperly admitted and im-

properly played for the jury during deliberations, that certain testimony was inadmissible hearsay, and that the trial court erred in refusing to subpoena a witness on the issue of the authenticity of the tape recording. We affirm the conviction.

Appellant was a burglary detective with the Seattle Police Department. In 1973, he arrested Nicholas Kyreacos on suspicion of credit card forgery. He testified that Kyreacos made several threats against him at that time and thereafter. Shortly before Kyreacos was scheduled to be tried on the forgery charge, the complaining witness in that case, one Branko Ellich, Kyreacos' co-worker at a Seattle restaurant, was shot and killed. Kyreacos became a suspect in that murder.

After the Ellich murder, appellant borrowed, from fellow officer Detective Hortin, a .45 caliber automatic weapon, specifically requesting one which could not be traced. Appellant told Detective Hortin "that he was going to have a girl, or had had a girl call Kyreacos, and that he wouldn't have to worry about Nick anymore."

On November 19, 1973, at 3:20 p.m., the receptionist at Kyreacos' place of work received a telephone call from an unidentified woman who asked for Kyreacos. At the time Kyreacos was not present. On November 20, the same person called again. This time Kyreacos was present and accepted the call, and was apparently disturbed by it. A cocktail waitress at the restaurant, Mrs. Gwen Wesselius, later testified over objection that, within minutes after the call, Kyreacos told her that the caller had claimed to have information about Branko Ellich and wanted to meet Kyreacos in an alley between 6 and 6:15 p.m. that evening. Kyreacos told Mrs. Wesselius he intended to keep the appointment. The alley to which he was directed is immediately behind a mortgage company, where appellant was employed in an off-duty job escorting employees to their cars in the parking lot behind the building.

Kyreacos next went to his attorney's office. From there,

he called the Seattle Police Department, and was told that police protection could not be provided. He then purchased a small tape recorder, receiving instructions in its operation by way of demonstration on a store model.

He asked his next-door neighbor, Mike Premel, to accompany him downtown. On the way, he showed Premel a switchblade knife, a toy pistol and a set of walkie-talkies. He also displayed for Premel the new tape recorder, which he concealed under his clothing, attaching the microphone to his shirt. He parked near the alley in question, gave Premel a walkie-talkie, took the other, and proceeded toward the alley. Premel remained near the car. The walkie-talkies did not work. Kyreacos walked into the alley, where appellant was sitting in his truck. The shooting events occurred, and Kyreacos was killed, shot four times by a police .38 and once by a .45. Appellant was wounded twice by the .45. Appellant gave a statement to the investigating police officers in which he consistently referred to the weapons as "his gun" and "my gun." Before Kyreacos' body was moved from the scene, police officers discovered a half-smoked cigarette in Kyreacos' right hand. The tape recording was discovered during an autopsy in the medical examiner's office. The microphone was recovered from Kyreacos' clothing in a damaged but operative condition.

The tape was found to contain an apparently complete recording of the shooting events which resulted in Kyreacos' death. That recording was inconsistent with the version of the facts given to the police by appellant, whose story was essentially as follows:

He had been working off duty at the mortgage company, and was sitting in his parked truck in the alley behind the building when Kyreacos entered the alley. Appellant asked Kyreacos what Kyreacos was doing there, and Kyreacos replied that he was looking for appellant. Appellant thought Kyreacos was armed and therefore drew his gun, jumped out of his truck, and chased Kyreacos down the alley. He fired a shot at Kyreacos, and chased Kyreacos around the corner onto the Pike Street sidewalk, where

appellant shouted to Kyreacos to stop. Kyreacos stopped. Appellant didn't frisk Kyreacos because he had heard something drop during the chase and assumed it was Kyreacos' gun. Appellant grabbed Kyreacos by the arm and led him back into the alley and put him up against his truck, in a "frisk" position. Kyreacos then pulled a .45 caliber pistol from inside his own clothing and started firing. Appellant also fired, emptying his police .38, then dropped his gun and started to struggle with Kyreacos over Kyreacos' weapon, which discharged several other times, wounding appellant. Kyreacos was wounded several times and finally ceased struggling, and appellant asked a passerby to call the police.

At trial, appellant's testimony was substantially similar to his statement, except that he acknowledged the .45 caliber weapon to be his and testified that Kyreacos reached into appellant's clothing for the weapon.

The tape contradicts appellant's statements in several material respects. The tape begins with remarks by Kyreacos, introducing Mike Premel and stating his destination. The two men discuss the walkie-talkies and other arrangements, and Kyreacos starts toward the designated alley. As he walks he narrates, describing the scene around him and describing with particular care each person in the vicinity. Remarking "Everything looks quite normal," he says he is turning into the upper part of the alley. Then, suddenly are heard the sounds of running footsteps and shouting, the words "Hey!" and "Hold it!", Kyreacos saying "Dave Smith," and a sound resembling a gunshot. The running stops, and Smith tells Kyreacos to turn around. Kyreacos asks, "What's the deal?" Smith replies, "You know what the deal is. I'll tell you one thing baby, you have had it."

Several more words are exchanged, not all of which are clearly intelligible, about whether Smith has "a charge." Then Kyreacos asks, "If you wanted me, why didn't you come to see me?" Smith replies, "I'll tell you why." A moment later, another shot is heard. The quality of the recording becomes "tinny." (There was expert testimony

that this shot damaged the microphone.) Then Kyreacos, screaming, repeatedly begs for his life. More shots are fired. There is a slight pause, two more shots are heard, then certain unclear sounds, then silence. After a period of nearly complete silence, a voice is heard to say, "We've already called the police." Another voice says, "Hey, I think this guy's dead, man." Afterward, the tape records police sirens and the sounds of the officers investigating.

The tape was played for the jury, over objection, twice during the trial and once during jury deliberations at the request of the jury. The procedure for playing the tape during deliberations involved the presence of the judge, the jury, the bailiff, the court reporter, and the clerk, who operated the tape recorder. Counsel and the defendant were not permitted to be present. The tape was first played the sixth day of the trial; that evening a Seattle television station broadcast a copy of the tape over the air. Defense motions to call the broadcaster to testify as to the origin of the station's copy of the tape were denied. Error is assigned to admission of the tape, to the procedure for playing the tape to the jury during deliberations, to denial of the subpoena of the broadcaster, and to the admission of the allegedly hearsay testimony of Mrs. Wesselius.

## I.

Initially, we must decide whether the tape recording was properly admitted into evidence and played for the jury. Appellant contends that the tape was made in violation of RCW 9.73.030(2),[1] and that RCW 9.73.050[2] therefore ren-

---

[1]"Except as otherwise provided in this chapter, it shall be unlawful for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, record or divulge any:

". . .

"(2) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation." RCW 9.73.030.

[2]"Any information obtained in violation of RCW 9.73.030 or pursuant to any order issued under the provisions of RCW 9.73.040 shall be inadmissible in any civil or criminal case in all courts of general or

ders it inadmissible. The Washington statute is somewhat unusual in prohibiting the interception of communications without the consent of *all* participating parties. (Analysis based solely on the Fourth Amendment has repeatedly resulted in a construction which permits "participant monitoring," or interception where one party consents. *See* Greenawalt, *The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in a Conversation,* 68 Colum. L. Rev. 189 (1968).)

■ Our statutes have not before been considered by this court. The Court of Appeals, Division One, did consider RCW 9.73 in *State v. Grant,* 9 Wn. App. 260, 511 P.2d 1013 (1973). Appellant seeks to rely on *Grant* in support of his position that the tape was inadmissible. In *Grant,* the Court of Appeals excluded a tape recording of a statement made to an interrogating police officer, but admitted the officer's testimony as to the statement. The facts of *Grant* are almost classically within the statutory prohibition. None of the participants were aware of the surreptitious recording device, and the material recorded was clearly "private conversation" within the simple meaning of that term. However, the special circumstances of the present case compel us to arrive at a different result. We are convinced that the events here involved do not comprise "private conversation" within the meaning of the statute. Gunfire, running, shouting, and Kyreacos' screams do not constitute "conversation" within that term's ordinary connotation of oral exchange, discourse, or discussion. We do not attempt a definitive construction of the term "private conversation" which would be applicable in all cases. We confine our holding to the bizarre facts of this case, and find that the tape does not fall within the statutory prohibition of RCW

limited jurisdiction in this state, except with the permission of the person whose rights have been violated in an action brought for damages under the provisions of RCW 9.73.030 through 9.73.080, or in a criminal action in which the defendant is charged with a crime, the commission of which would jeopardize national security." RCW 9.73.050.

9.73.030, and thus its admission is not prohibited by RCW 9.73.050.

 Appellant contends further that the State failed to establish sufficient foundation for admission of the tape. Primarily, appellant argues that the tape's authenticity was not established, emphasizing that the material facts recorded on the tape are not verbal and are therefore not subject to accurate tape recording. The requirements for admission of such a tape are set forth in *State v. Williams*, 49 Wn.2d 354, 360, 301 P.2d 769 (1956), quoting and adopting the rule set down by the Georgia court in *Solomon, Inc. v. Edgar*, 92 Ga. App. 207, 88 S.E.2d 167 (1955):

> (1) It must be shown that the mechanical transcription device was capable of taking testimony. (2) It must be shown that the operator of the device was competent to operate it. (3) The authenticity and correctness of the recording must be established. (4) It must be shown that changes, additions, or deletions have not been made. (5) The manner of preservation of the record must be shown. (6) Speakers must be identified. (7) It must be shown that the testimony elicited was freely and voluntarily made, without any kind of duress."

Appellant contends these requirements are applicable only if modified to compensate for the unusual circumstances of this case. The unusual circumstances cited are: the fact that the operator of the recording device is unavailable; there are no eyewitnesses to the material portion except the defendant; a material portion of the recording consists of sounds other than spoken words; the recording contains emotional material; and the recording device was recovered in a damaged condition. Appellant contends the State has failed to meet several of the *Williams* criteria and has particularly failed to establish authenticity and correctness.

Appellant is correct in his allegation that the material contained in the tape is emotive. Nevertheless, the foundation requirements set forth in *State v. Williams*, *supra*, do appear to be fully met. There was expert testimony that the mechanical devices were capable of recording; the

State's tape expert testified that both microphone and recorder were in operating condition. Kyreacos had received instruction in operation of a similar machine. The tape was unqualifiedly corroborated as to the accuracy of its content for the first minutes of recording and for the events subsequent to the shooting. The preservation of the tape was thoroughly documented. It is highly unlikely that Kyreacos made changes and deletions because of lack of opportunity, and the chain of custody appears inconsistent with any opportunity for changes to be made by anyone else. The speakers were identified by witnesses familiar with their voices, and appellant was not under duress when the recording was made.

The chief question in establishing a foundation for the tape relates to authenticity and accuracy. We believe the tape's authenticity was sufficiently established. The tape is directly corroborated by independent testimony as to the events recorded at its beginning and end. The circumstances of the confrontation between Smith and Kyreacos are corroborated by several items of external evidence, including several witnesses who either saw the two men together, on the street or in the alley, or who heard gunshots. Appellant's version of the struggle is refuted not only by the tape, but by the presence of a half-smoked cigarette in Kyreacos' right hand, and, inferentially, by the testimony of Detective Hortin and Mrs. Wesselius. We conclude that the authenticity of the tape was established, that the tape was properly qualified, and was admissible.

Our conclusion that the tape was authentic, and therefore basically reliable, leads us to our next consideration. Appellant contends that admission of the tape violated his Sixth Amendment right to confront the witnesses against him, that issues of authenticity of the tape are inextricably intertwined with the confrontation right, and that the State should have produced "a confrontable witness who can verify the accuracy of the material aspects of mechanical reproduction of the occurrence the reproduction purports to prove." (Appellant's Reply Brief at 15.)

The exact requirements of the confrontation clause have not been delineated by the United States Supreme Court. *See* J. Cook, *Constitutional Rights of the Accused, Trial Rights* 37 (1974); Graham, *The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One,* 8 Crim. L. Bull. 99 (1972); Ashley, *The Uncertain Relationship Between the Hearsay Rule and the Confrontation Clause,* 52 Texas L. Rev. 1167 (1974). However, the guidelines chiefly relied on by the court in its recent decisions appear to be: (1) reliability of the testimony sought to be admitted, and (2) availability of the source (the out-of-court declarant) to appear, swear, and be cross-examined. *Dutton v. Evans,* 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970); *California v. Green,* 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970).

In *Dutton,* an incriminating statement was made in prison by an alleged coconspirator to another prisoner, who later testified. The court admitted the testimony, stating it did not constitute "crucial" evidence, prosecutorial misconduct, use of a paper transcript, nor wholesale denial of cross-examination, as had earlier Sixth Amendment cases. The court found "indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Dutton v. Evans, supra* at 89. The court did not define "indicia of reliability," but specifically referred to external corroboration, the extremely remote possibility of faulty recollection, spontaneity, and the fact that the statement was against the declarant's penal interests. The court emphasized that the function of the confrontation clause is one of advancing the reliability of convictions:

> The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green,* 399 U. S., at 161.

*Dutton v. Evans, supra* at 89.

These two considerations then fall together: reliability of conviction is to be safeguarded; when an actual confrontable witness is not produced, hearsay statements sought to be admitted against the defendant must be shown to be *reliable*. While the trial judge below did not address specifically the Sixth Amendment issue, he clearly ruled that the tape was authentic and accurate. The factors discussed above in our consideration of that ruling are relevant here as well; several of those factors—corroboration, remote possibility of faulty recording, spontaneity—would apply to a Sixth Amendment analysis. We consider the tape to be reliable and properly admitted.

Not surprisingly, research discloses no case with facts congruent to those presented here. A few cases have admitted evidence somewhat similar. *Callahan v. State*, 229 Ga. 737, 194 S.E.2d 431 (1972), recording of decedent victim's statements made while en route to murder scene—admitted; *State v. Hill*, 211 Kan. 287, 507 P.2d 342 (1973), recorded phone calls of witness who claimed privilege and refused to testify—admitted. But few courts have, on facts in any way resembling these, attempted any analysis of the confrontation clause. Most courts have indeed equated the confrontation clause with the hearsay rule, admitting testimony which falls within an exception to the rule. *Callahan v. State, supra; State v. Hill, supra.* This equation the Supreme Court has clearly repudiated. *California v. Green, supra; Dutton v. Evans, supra.* However, the relationship between the rule and the constitution is unclear; suffice it to say that res gestae and spontaneous utterances are exceptions adequate to admit the tape if strict hearsay analysis is applied.

We do not consider this case, involving, as it does, a sound recording of not just a more or less incriminating statement but the entire event in question, to be the appropriate vehicle for an examination of the shadowy outlines of the confrontation clause. The existence of the tape presents unique considerations from which no precise rule can be formulated. We conclude that to require the State to

produce an eyewitness or forego the use of the tape in evidence is to require too much when the authenticity of the tape is firmly established. Here, the State has shown the reliability of the tape, and the "unavailability" of Kyreacos is of course the reason for the trial in the first place. We are cognizant that where, as here, the evidence sought to be admitted is crucial to the State's case, the right of confrontation is critical. *Dutton v. Evans, supra.* Where no confrontable witness is produced, it must be shown that production is somehow excused; if the excuse is unavailability, then the unavailability of the declarant must be certain, and the reliability of the evidence must be otherwise established. These requirements are here met.

## II.

Appellant next argues that the playing of the tape during jury deliberations resulted in undue emphasis and repetition, and that the procedure followed by the trial court in excluding counsel and defendant was per se prejudicial, amounting to a communication by the judge to the jury. The tape recording, the recording machine, the batteries, and the microphone were all duly admitted exhibits. As such, they would ordinarily go into the jury room. CrR 6.15(e). The record establishes that the procedure adopted by the trial court, which involved sending a copy of the tape, but without a machine capable of playing it, was intended to preserve the integrity of the original tape and to avoid undue emphasis and repetition. The trial court ruled that if the jury wished to listen to the tape and so requested, the machine would be operated in controlled circumstances by an experienced person in open court. Such a procedure seems eminently reasonable in view of the nature of the tape recording and the necessity for preserving the integrity of the original tape.

The jury did request to hear the tape. The judge called in and advised both counsel and defendant that the tape would be played, and heard arguments from counsel as to whether the proceeding was more properly considered part of the actual trial or part of the jury deliberations. Appar-

ently determining that the proceeding was part of the jury's deliberation, the court excluded parties and spectators from the courtroom, and the tape was played in the presence of the court, the jury, the court reporter, the clerk, and the bailiff. Counsel were advised as to what instructions the court would give the jury, and the court reporter was directed to transcribe all proceedings. The tape was played, and the judge returned the jury to the jury room to continue deliberations.[3]

Appellant assigns error to this proceeding as constituting communication by the judge with the jury outside the presence of the defendant and counsel, which appellant argues is per se prejudicial, citing *State v. Robinson*, 84 Wn.2d 42, 523 P.2d 1192 (1974), and many other cases. However, these cases involve situations in which the court communicated with the jury in the absence of the parties and without consulting them. In one of the cases on which appellant seeks to rely, the court stated:

> In the discharge of his official duty the place for the judge is on the bench. As to him the law has closed the portals of the jury room and he may not enter. The appellant was not obliged to follow the judge to the jury room in order to protect his legal rights, or to see that the jury was not influenced by the presence of the judge; and the state cannot be permitted to show what occurred between the judge and the jury at a place where the judge had no right to be, and in regard to which no official record could be made.

*State v. Wroth*, 15 Wash. 621, 623, 47 P. 106 (1896).

In *Wroth* and the other cases cited by appellant, the facts indicate a private conversation between the judge and the jury and usually involve the judge entering the jury room, so that the parties were unable to determine what transpired. Clearly, that is not the case here. The remarks of the judge to the jury were entirely circumspect and in no way amounted to a secret communication. They were

---

[3]With respect to the argument that the playing of the tape was a "part of the jury's deliberation" note should be taken of *Rogers v. United States*, 422 U.S. 35, 45 L. Ed. 2d 1, 95 S. Ct. 2091 (1975).

communicated to counsel and the defendant beforehand, and were transcribed by the court reporter. Under these circumstances, at least a possibility of prejudice must be shown. *O'Brien v. Seattle*, 52 Wn.2d 543, 327 P.2d 433 (1958). In the present case, while we do not commend the trial court's procedure of excluding counsel and appellant, we find no possible prejudice to appellant under the circumstances. The error, if any, was harmless. The procedure for playing the tape to the jury was in some measure discretionary with the trial court, and we find no abuse of that discretion.

## III.

Appellant next contends that the trial court erred in admitting the testimony of Mrs. Gwen Wesselius, asserting that such amounted to no more than hearsay. Her testimony was admitted by the court as falling within the res gestae exception to the hearsay rule.

As heretofore indicated, Mrs. Wesselius testified on direct examination that Kyreacos told her he received a phone call from a woman who said she had information with respect to Branko Ellich and that she wanted him to meet her in the designated alley between 6 and 6:15 p.m. that evening. Further details of the telephone call and the conversation with Mrs. Wesselius were brought out, some on cross-examination, relating to Kyreacos' intention to keep the appointment, a fear of the consequences of the meeting, the desirability of some form of protection, and the need to contact his attorney.

Counsel in their briefs confine their arguments to the applicability of the res gestae exception to the hearsay rule; however, we find the testimony admissible upon at least two interrelated theories, neither of which is necessarily exclusive of the other, *i.e.*, statements of design and purpose, and as a part of the res gestae, sometimes characterized as "spontaneous exclamations" or "excited utterances." *See Admissibility of statements made by deceased with reference to purpose or destination of a journey or trip he was about to make*, Annot., 113 A.L.R. 268 (1938).

■ With respect to the first theory, Professor Wigmore explains it as follows:

> § 1725. Statements of Design or Plan. It has already been seen (*ante*, § 102) that the existence of a *design* or *plan to do* a specific act is relevant to show that the act was probably done as planned. The design or plan, being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct (*ante*, §§ 253, 300). But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception [to the hearsay rule] by the *person's own statements* as to its existence.
>
> The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this Exception (*ante*, § 1714), namely the statements must be of a *present existing state of mind*, and must appear to have been made in a natural manner and not under circumstances of suspicion. . . .
>
> . . .
>
> The use of such statements of design or plan is illustrated in a variety of precedents. The typical situation, it must be noted, involves (1) the doing of an act which is in some way part of the issue or relevant thereto, (2) the existence of a design or plan to do this act, as evidence (*ante*, § 102) of the probable doing of the act, and (3) the hearsay use, under the present Exception, of the person's statements of this design or plan.
>
> In most of the precedents, the issue involves the conduct of a *victim of a crime*, or of an *insured person*, or of a *sufferer from an injury*.

6 J. Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* § 1725 (3d ed. 1940).

That this court has recognized, accepted, and applied this exception to the hearsay rule is evidenced by our decisions in *State v. Power*, 24 Wash. 34, 63 P. 1112 (1901); *State v. Paschall*, 182 Wash. 304, 47 P.2d 15 (1935); *Doke v. United Pac. Ins. Co.*, 15 Wn.2d 536, 131 P.2d 436 (1942); *State v. Payne*, 25 Wn.2d 407, 171 P.2d 227 (1946); *State v. Hart*, 26 Wn.2d 776, 175 P.2d 944 (1946); *Raborn v. Hayton*, 34 Wn.2d 105, 208 P.2d 133 (1949); *Ford v. United Bhd. of*

*Carpenters*, 50 Wn.2d 832, 315 P.2d 299 (1957); and *Hall v. American Friends Serv. Comm., Inc.*, 74 Wn.2d 467, 445 P.2d 616 (1968).

We are satisfied Mrs. Wesselius' testimony clearly falls within the ambit of this exception and was perforce properly admitted.

■ With respect to the second theory, *i.e.*, utterances as part of the res gestae, this court early noted that such spontaneous utterances need not be contemporaneous to the main event and that the issue of remoteness rests, to some extent, in the sound discretion of the trial court. *Walters v. Spokane Int'l Ry.*, 58 Wash. 293, 108 P. 593 (1910).

■ In *Beck v. Dye*, 200 Wash. 1, 9-10, 92 P.2d 1113, 127 A.L.R. 1022 (1939), we spelled out the requirements for admissible testimony under the res gestae exception as follows:

> (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

The Wesselius testimony meets these criteria. The meeting of the first, third, and sixth requirements is conceded by appellant. It appears from the record that the second, fourth, and fifth are also met. The statements were made to Mrs. Wesselius immediately after receiving the telephone call. There is independent testimony in the record that

Kyreacos came directly from the call, made a brief stop at the reception desk of the restaurant, was very pale and upset, and within minutes was talking to Mrs. Wesselius, who also testified that he was nervous. It thus appears clear that his statements amounted to a natural declaration evoked by the telephone conversation and made under circumstances which exclude opportunity for deliberate fabrication. Furthermore, it was, at least, a part of the res gestae of the telephone call, which, in turn, was relevant to and explanatory of the main event.

We conclude that the testimony of Mrs. Wesselius was properly admitted.

### IV.

Appellant finally argues that the trial court erred in refusing to subpoena the television newscaster who had played a copy of the tape over the air. The essence of appellant's argument is that the fact that the newscaster possessed a copy of the tape in itself impeaches the official custody of the original tape. However, official custody was extensively documented, and the original documentation was to a large extent reiterated, in the absence of the jury, at the time of the motion to subpoena the broadcaster. The action of the trial court in recalling the custodian of the tape before ruling on the motion was reasonable under the circumstances.

Under court rules, appellant could himself have subpoenaed the broadcaster. CrR 4.8, CR 45 (a) (1). This he chose not to do. Under these circumstances a request to the trial court to issue a subpoena is addressed to the discretion of the trial court, and an adverse decision thereupon will be overturned only on a showing of prejudice.

That the question of compulsory process in criminal cases involves such disparate elements as surprise, diligence, materiality and maintenance of orderly procedure may be seen in a number of cases which turn on whether the accused has made a reasonable showing of these factors [citing cases]; and this court leaves the decision largely to the discretion of the trial court to be disturbed

only on a showing that the accused was prejudiced by the denial.

*State v. Edwards*, 68 Wn.2d 246, 255, 412 P.2d 747 (1966).

In view of the fact that the record establishes that the original tape was intact, appellant is unable to show any significant prejudice flowing from the trial court's ruling. We accordingly find no abuse of discretion.

In conclusion, our review of the record satisfies us that appellant was ably represented, received a fair trial free of prejudice or reversible error, and one in conformity with due process of law. The conviction, therefore, is affirmed.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, WRIGHT, BRACHTENBACH, and HOROWITZ, JJ., concur.

UTTER, J. (dissenting)—Although I sympathize with the majority's dilemma, I cannot join in its approval of the admission of the tape recording of the brutal events that produced this case. I cannot imagine what would constitute a "private conversation" within the meaning of RCW 9.73.030 (2) if the series of questions and answers recorded on this tape and related in the majority opinion does not, and I cannot agree that the fact that some sounds on the tape were not "conversation" places the entire tape outside the statutory prohibition of recording without consent. I believe that the admission of all of this recording was therefore clearly prohibited by RCW 9.73.050.

It may seem incredible that evidence as plainly probative as this tape recording would be unusable in a criminal trial; but modern rules of evidence are riddled with rules that exclude from court otherwise useful information in order to promote some collateral policy of the law. The provisions of RCW 9.73 embody such a policy, and by their plain language they should apply here.

It is always difficult to reverse criminal convictions because evidence that clearly demonstrates guilt was improperly received. The reluctance to apply the law and the

temptation to carve out exceptions to it are particularly strong when the rules requiring exclusion are court-made and the judiciary feels itself in opposition to the other branches of government in enforcing its policies. *See State v. Shoemaker*, 85 Wn.2d 207, 215, 533 P.2d 128 (1975) (Utter., J., dissenting). But here we have an exclusionary rule created by the legislature, designed to implement its policy decisions. Even if we believe that the particular application of the legislative rule would be unjust or unwise in this case, we are bound to enforce the plain language of the statutes. Although the facts of this case are difficult in this respect, I cannot join in the majority's decision to place it outside the law as a unique and unjustified exception. It seems to me that the statute as written, forces us to hold that the verbal exchanges between the defendant and his victim were indeed a "private conversation," making the recording of them inadmissible under the wording of RCW 9.73, and I would reverse the trial court.

Petition for rehearing denied December 3, 1975.