[No. 6832–3–III.   Division Three.   September 23, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. MIGUEL ALVAREZ, *Appellant.*

*Miguel Alvarez,* pro se, and *Douglas S. Haynes* (of *Thorner, Kennedy, Gano & Rowley, P.S.*), and *Richard L. McKinney,* for appellant (appointed counsel for appeal).

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Donald E. Kresse, Jr., Deputy,* for respondent.

MUNSON, J.—Miguel Alvarez appeals a judgment entered on a jury verdict in which he was found guilty as an accomplice to first degree murder in the death of Lupe Mendez and not guilty as an accomplice to second degree murder in the death of Gabriel Mendez. We affirm, after discussing the assignments of error seriatim.

The record supports the following facts, although there is a great deal of conflict in the testimony. Late in the evening of July 1, 1984, the defendant and his brother, Jose, also known as Popo, were involved in a heated argument at a tavern with one of the victims and another individual. After the tavern closed, the Alvarez brothers went to the residence where the shooting later occurred and made inquiries about the victims. When Serafin Martinez advised them the Mendezes were not there, Popo stated they were looking for them in order to kill them. The defendant and his brother then left.

They returned 30 minutes later; both were armed with handguns. They located the victims in a bedroom. Immediately prior to shots being fired, Popo made the statement: "We came to kill you." No objection was raised to admission of this statement; it was corroborated by another wit-

ness present during the murders.

While Mr. Martinez was the only witness to establish the defendant returned with Popo and entered the bedroom, other testimony and physical evidence recovered by police were consistent with his testimony. Two women, present in the bedroom during the murders, acknowledged the defendant may have been there, although they could not specifically recall seeing him. One woman was admittedly drunk at the time; the other's attention was drawn to Lupe Mendez.

Further, Mr. Martinez's account of the shootings was consistent with that of the two women in several significant respects so as to corroborate his presence when the murders occurred. All three witnesses agreed Popo shot Lupe Mendez. The fact the women did not recall Mr. Martinez being in the bedroom at that exact moment of the shootings can be attributed to the same reasons they did not recall seeing the defendant. Moreover, 10 shell casings were found at the scene of the crime. Eight of the casings were .22 caliber; the other two appeared to be .32 caliber. Seven bullets retrieved from the bodies of the victims and one found on the bed apparently came from the same .22 caliber weapon. This supports Mr. Martinez's testimony that both the defendant and his brother were armed and two weapons were fired.

First, Mr. Alvarez assigns error to the trial court's allowing testimony of the statement his brother, Popo, allegedly made in his presence on the first occasion the Alvarez brothers came to the residence. The court overruled the defendant's objection to this testimony after determining the out–of–court statement provided circumstantial evidence of the declarant's (Popo's) then existing state of mind. The court further found Popo unavailable, that the statement was spontaneous and trustworthy in the sense it was against penal interest, and it was corroborated by the declarant's undisputed involvement in the homicides 30 minutes later.

Out–of–court statements which tend to prove a plan,

design, or intention of the declarant are admissible under ER 803(a)(3).[1] *See generally* 5A K. Tegland, Wash. Prac., *Evidence* § 364 (1982 & Supp. 1986). Here, Serafin Martinez's testimony was admissible as tending to prove the underlying offense for which the defendant was charged as an accomplice; *i.e.*, Popo's intention to kill the victims and his premeditation to do so. The statement, likewise, tended to establish the accused's knowledge of that crime, assuming the jury chose to believe he was present when the statement was made, standing within 3 meters of the declarant, and overheard it. *See United States v. Sears,* 663 F.2d 896, 904 (9th Cir. 1981); *see also* K. Tegland § 336. For this purpose, the evidence is not subject to challenge as hearsay. K. Tegland § 336; *see also State v. Mounsey,* 31 Wn. App. 511, 522 n.3, 643 P.2d 892, *review denied,* 97 Wn.2d 1028 (1982); *State v. Haga,* 13 Wn. App. 630, 637, 536 P.2d 648, *review denied,* 86 Wn.2d 1007 (1975), *cert. denied,* 425 U.S. 959, 48 L. Ed. 2d 204, 96 S. Ct. 1740 (1976).

Popo's statements were evidence of his present existing state of mind shortly before the murders and "appear to have been made in a natural manner and not under circumstances of suspicion." *Ford v. United Bhd. of Carpenters,* 50 Wn.2d 832, 837, 315 P.2d 299 (1957); *see also State v. Smith,* 85 Wn.2d 840, 854, 540 P.2d 424 (1975). Likewise, their admission was necessary because the declarant was admittedly unavailable; "there is [also] circumstantial probability of [their] trustworthiness," since the declarant returned to the residence, in the company of this defend-

---

[1]ER 803 states:

"**(a) Specific Exceptions.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

". . .

"(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

ant, for the purpose indicated by his earlier statement. *Raborn v. Hayton*, 34 Wn.2d 105, 108–09, 208 P.2d 133 (1949).

Although Mr. Alvarez claimed he was not present when the statements were allegedly made, this contention goes to the weight of Mr. Martinez's testimony rather than its admissibility. By the same token, whether there was, in fact, any inconsistency in Mr. Martinez's testimony concerning Popo's statements goes to the issue of witness credibility and was a matter for the jury to decide.

Mr. Alvarez also claims admission of this evidence violated his constitutional right to confront adverse witnesses. This contention is not well taken in light of *State v. Bernson*, 40 Wn. App. 729, 739, 700 P.2d 758, *review denied*, 104 Wn.2d 1016 (1985), wherein we stated:

> The admissibility of hearsay against a defendant in a criminal case is subject to overriding constitutional considerations. "The sixth amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to confront witnesses against him." *State v. Parris*, 98 Wn.2d 140, 144, 654 P.2d 77 (1982). When hearsay is admitted, this constitutional guaranty requires a determination of "(1) reliability of the testimony sought to be admitted, and (2) availability of the source (the out–of–court declarant) to appear, swear, and be cross–examined". *State v. Smith*, [85 Wn.2d 840, 849, 540 P.2d 424 (1975)]. Ms. Remington's death satisfies the requirement of unavailability. The concern is, therefore, with the reliability of the statements.
>
> "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *State v. Parris, supra* at 145 (quoting *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)). Here, the statements clearly fell within the ambit of ER 803(a)(3), a hearsay exception which is well recognized in Washington. *See State v. Smith, supra* at 854, and citations. We find no error in the admission of this evidence.

(Footnote omitted.)

Here, the declarant was unavailable in the constitutional sense since he was admittedly in Mexico. *Mancusi v.*

*Stubbs,* 408 U.S. 204, 33 L. Ed. 2d 293, 92 S. Ct. 2308 (1972). Reliability can be inferred without more because the out–of–court statements "clearly fell within the ambit of ER 803(a)(3)". *Bernson,* at 739. Hence, no right of confrontation was violated.

In addition, from our review of the record and the facts set forth herein, if there was an error it was harmless. While we have no transcription of the closing arguments, the admission of the testimony regarding Popo's statement finally was admitted late in the trial, but without much emphasis; the result would not change if this statement had been suppressed.

■ Second, Mr. Alvarez contends the prosecutor failed to disclose that when Mr. Martinez was taken into custody as a material witness, he had cocaine on his person; thus, his right to a fair trial was prejudiced. In this regard, the omission must be evaluated in the context of the entire record. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *see also State v. Koloske,* 100 Wn.2d 889, 899, 676 P.2d 456 (1984). A conviction must be set aside and a new trial ordered only when the undisclosed evidence creates a reasonable doubt that did not otherwise exist. *State v. Williams,* 96 Wn.2d 215, 229, 634 P.2d 868 (1981).

The prosecutor apparently first learned of Mr. Martinez's cocaine possession just prior to final argument to the jury. There is no indication the defense made a request for discovery of this or any other evidence concerning Mr. Martinez.

After trial, Mr. Martinez was charged with unlawful possession of a controlled substance; he pleaded guilty, was sentenced, and given credit for time served while held as a material witness in the present case. At oral argument, the prosecutor indicated Mr. Martinez was not given any special consideration in terms of the charge; there is no evi-

dence suggesting otherwise.

Mr. Alvarez asserts that had the jury been apprised of Mr. Martinez's arrest this may have caused the jurors to give less weight to his testimony and could have explained certain purported inconsistencies therein. However, this is nothing more than conjecture and does not establish materiality in the constitutional sense so as to require reversal of the conviction. Evidence of the arrest of the witness would not be admissible, *see State v. Harmon,* 21 Wn.2d 581, 588, 152 P.2d 314 (1944), unless there was a further showing of possible prejudice or bias toward the defendant as a result. *See State v. Vavra,* 33 Wn. App. 142, 146, 652 P.2d 959 (1982). Here, there was clearly no understanding or agreement between the prosecutor and the witness concerning the disposition of the cocaine offense which could be perceived as influencing Mr. Martinez's testimony. *Vavra,* at 146.

Moreover, the record indicates any possible concern the witness may have had about his arrest was outweighed by his concern over his personal safety in testifying adversely to the defendant. Not only was he taken into custody in order to assure his presence at trial, but he admitted that his testimony was affected by the presence of another brother of the defendant and another individual in the courtroom. Prior to this time, Mr. Martinez stated he would "have to walk with precaution" once outside of jail. Under the circumstances, there was no reasonable likelihood the witness' testimony was significantly influenced, if at all, so as to require the conviction be set aside on the basis of the prosecutor's omission. *Koloske,* at 899.

■ Third, Mr. Alvarez challenges the sufficiency of the evidence to support his conviction, claiming the State's chief witness, Mr. Martinez, was not credible given 13 purported inconsistencies in his testimony and a lack of corroboration thereto. However, it has never been the province of *this* court to judge witness credibility; that responsibility lies with the jury which alone had the opportunity to view the demeanors of those testifying. Our review of the evi-

dence is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*" *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)). As indicated, we find the evidence sufficient to support the verdict.

Fourth, although for the first time on appeal, Mr. Alvarez contends the verdicts are inconsistent—he having been acquitted on the charge associated with Gabriel Mendez's death (there was testimony he shot Gabriel), whereas Popo shot Lupe Mendez. Apparently, the jury chose to believe Mr. Martinez's testimony in this regard and would explain why the defendant was acquitted in Gabriel's death. This defendant was not prejudiced by the jury's finding.

Fifth, Mr. Alvarez contends he should have been granted a new trial because in his post–trial motion he had located a witness who would testify he had been with the defendant, without Popo, after leaving the tavern and at the time of the first occasion Mr. Martinez testified this defendant and his brother came to the residence. This was not newly discovered evidence; the defendant knew of this witness, but evidently had not been able to locate him prior to trial. The testimony merely corroborated the defendant's testimony. The "missing" witness testified at the post–trial motion that he had lived in the same residence prior to, during, and after the homicide and up to the present time. While the defendant contends he attempted to locate this witness, the effort expended in that regard is not of record. Further, the witness would not contend he was with the defendant at the time of the homicide, but would testify they had separated prior thereto. Thus, he could not corroborate the defendant's testimony that this defendant was walking up to the residence where the homicide occurred at the time the shots were fired. We find the trial court did not abuse its discretion in denying the motion for new trial on this ground.

Likewise, a new trial would not have been justified on the basis of the letter purportedly written by Popo while he was in Mexico, claiming full responsibility for the deaths of the victims. It was patently self–serving. K. Tegland §§ 403–05. The court did not err in denying the motion for a new trial. *State v. York*, 41 Wn. App. 538, 543, 704 P.2d 1252 (1985).

Sixth, the contention Mr. Alvarez was not accorded an interpreter or that his interpreter was not sworn is not borne out by the record.

Last, the contention he did not knowingly consent to a pro tempore judge is not well taken. The appropriate document agreeing to his service is contained in the record. We find this assignment of error without merit.

The conviction is affirmed.

THOMPSON, J., concurs.

McINTURFF, A.C.J. (dissenting)—I dissent. The principal issue of this case is credibility. While I agree with the majority's conclusion credibility must be decided by the jury, the evidence of this case, even under the test announced in *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980), demands reversal of the conviction. This conclusion is based on facts supported by the record, which differ significantly from the facts noted in the majority opinion.

The majority states Popo's statement "[w]e came to kill you", made immediately prior to the homicides, was corroborated by another witness. However, the record discloses the witness did not confirm the contents of the statement, only that Popo said two or three words immediately prior to shooting Lupe.[2]

---

[2]Ms. Akins testified on direct:
"Q. Did he say anything to anybody?
"A. He said something to Lupe but I don't know what he said.
"Q. Did Lupe say anything back to him?
"A. No.

The majority states other testimony and physical evidence corroborated Miguel's presence at the scene. However, neither of the women mentioned specifically by the majority were able to identify Miguel at the time of trial[3] and Ms. Akins testified that although it was possible two

"Q. Was it a long conversation? By that I mean did he say a lot of things to him, or something real short?

"A. He only said something like two words, two or three words.

"Q. What's the next thing he did?

"A. Then he shot Lupe.

"Q. If I understood, the man in black walks in, walks through the bedroom door, says something to Lupe and shoots him?

"A. That's right."

[3]On cross examination, Ms. Akins testified:

"Q. When you saw him out in the hallway a few minutes ago, what was your question?

"A. What question?

"Q. Do you remember seeing him out in the hallway just a few minutes ago?

"A. Yeah. Because Mary Lou asked me who was that guy and I says I am assuming that's the guy because he was the only one out there with a jailer so I thought he was the—whatever you call him.

"Q. The person who is accused?

"A. The accused, yes.

"Q. But you didn't know who he was, did you?

"A. No.

"Q. And you made your assumption based on the fact that he appeared to be in custody?

"A. Yes. Mary Lou brought that question to me and I told her I am assuming that's him; I have never seen him.

"Q. You and Mary Lou were seated on a bench just outside this doorway?

"A. Yes, we were.

"Q. About 15, 20 minutes ago?

"A. Yes, we were.

"Q. And at that point you didn't think you had ever seen him before in your life?

"A. No."

Ms. Kublic testified on cross examination:

"Q. Mary Lou, do you know this man seated next to me in the blue vest?

"A. No, I don't.

"Q. You see him now. Do you think you have ever seen him before?

"A. No.

"Q. Did you see him in the hallway yesterday?

"A. Yeah, I seen him but I didn't know who he was.

"Q. You didn't know who he was?

"A. (Witness nodded negatively)."

men could have been present at the time of the shooting, it was only "possible."[4]

The majority also relies on the number and type of shell casings recovered at the scene, specifically eight casings of .22 caliber and two of .32 caliber. However, the police investigation revealed 10 casings of .22 caliber and two .32

---

[4]Ms. Akins testified on direct:

"A. Well, when the guy in the black walked in, I looked up at him because he said something to Lupe and I looked at Lupe and that's when he shot him; and then when Lupe fell, I looked at Lupe and I looked up again and the other guy was dead. He was laying on the floor.

"Q. Did you actually see the man in black shoot Gabriel or were you busy looking at Lupe?

"A. I was looking at Lupe.

"Q. How long was your attention diverted from looking at the man in black, you turn, you look at Lupe who is laying there beside you, and you look back and what do you see?

"A. Probably minutes.

"Q. When you looked back, what do you see? Is the man in black still standing there?

"A. No. There was nobody there.

"Q. Is it conceivable somebody could have walked into that bedroom for just an instant and gone and you wouldn't have seen them?

"A. Possibly."

Ms. Akins testified on cross examination:

"Q. You only saw one man walk through the door?

"A. Yes.

"Q. And the room is quite small?

"A. Uh–huh.

"Q. Tell this jury what is the likelihood that two men could have come in and two men with guns and two men firing shots and you missed one of them?

"A. The likelihood—

"THE COURT: Speak up.

"Q. Is that very likely?

"A. That two came—

"Q. Yes, or is it possible?

"A. It's possible but I only seen one.

"Q. And you have told us before, haven't you, that the room being so small, that chances are quite slim that you would have missed somebody that came in and fired a gun?

"A. Well, I was looking at Lupe. After I looked at Popo then I was looking at Lupe.

"Q. And then you looked up?

"A. And then Gabriel was shot.

"Q. And nobody was there?

"A. Nobody was there."

casings. Seven .22 caliber bullets were removed from the two bodies and one .22 caliber bullet was found on the bed next to Lupe's body. The extra two .22 casings were found in the hallway outside the bedroom; there is nothing in the record to indicate the location of the two bullets from these casings. Expert testimony also concluded these two casings were fired from a different gun. Given the location of the eight casings directly connected with the murders, the investigator surmised the perpetrator was standing just inside the bedroom door facing south, and the bed where Lupe was shot, when he committed the first murder; he then turned to the north–northeast and shot Gabriel, who was sitting on the floor.

It also was the conclusion of investigators that the .32 caliber casings were the remnants of a shooting which occurred in the same bedroom the night before the homicides and had nothing to do with the deaths of Lupe and Gabriel Mendez. Thus, there is *no* physical evidence which supports Mr. Martinez's conclusion[5] two guns were used to

---

[5]Mr. Martinez testified on direct:

"A. No. He only said, 'We came to kill you.'

"Q. What did he do then?

"A. Who, Lupe?

"Q. No. What did Jose do at that time?

"A. That's when he shot.

"Q. How many times did he shoot?

"A. Well, I don't—I don't know because it was so quickly, so rapid.

"Q. That was Jose, right?

"A. Yes.

"Q. What did Miguel do?

"A. He was at a corner where they were at.

"Q. Where who was at?

"A. Jose was in front and he was behind.

"Q. Did Miguel have the gun in his hand?

"A. Yes.

"Q. What did he do with the gun?

"A. He shot Gabriel.

". . .

"Q. Serafin, do you know anything about guns?

"A. No. I have never used them.

"Q. When you looked at the guns that Jose and Miguel had, were you able to tell what kind they were?

kill the victims, a .22 caliber and a .32 caliber, or that two men committed the murders.

"A. Well, one was a .32.
"Q. You know that for sure?
"A. No, because I don't know about weapons.
"Q. What color were they, do you know?
"A. Black.
"Q. Both guns: the one Miguel had and the one Jose had?
"A. Yes.
"Q. When the shots were fired, did bullets get spit out the side?
"A. Just from one.
"Q. What happened to the cases that came out?
"A. I don't know who picked them up.
"Q. Did they go on the floor?
"A. Yes.
"Q. One gun spit out shells?
"A. Yes.
"Q. Did the other one spit out shells?
"A. No.
"Q. Who had the gun that did not spit the shells out?
"A. Popo.
"Q. Popo had the one that the shells did not come out of?
"A. Yes.
"Q. The gun that Miguel had—
"A. —shells came out of his, yes.
". . ."
On cross examination, he stated:
"Q. Serafin, let's talk about the guns for a moment.
"A. Yes.
"Q. You said a moment ago that Popo's gun did not spit out shells?
"A. Yes.
"Q. And Miguel's gun did spit out some shells?
"A. Yes.
"Q. Which gun made the biggest noise?
"A. Jose's.
"Q. Was it a lot more noise or just a little bit?
"A. Very little difference.
"Q. Which one did you think was a .32?
"A. The one that Jose had.
"Q. Do you know a .32 from a .22 automatic?
"A. Yes.
"Q. Are you pretty sure that the one that Jose had was a .32?
"A. Yes.
"Q. And not a .22?
"A. Yes.
". . .
"Q. Now, Popo's gun didn't spit out any shells, did it?

In discussing the legal aspects of the case, the majority concludes Popo's statement, made 30 minutes prior to the

"A. No.

"Q. How many times did Popo fire that gun?

"A. I don't know, he shot rapidly and I don't remember how many he shot.

"Q. Did he shoot a lot of times?

"A. I just heard rapidly, rapidly, thus, thus (indicating). At the instance when they shot the bullets, I went outside because if I had waited there possibly I might have been shot too.

"Q. Is it true that Popo shot Lupe and Miguel shot Gabriel?

"A. Yes.

"Q. So Lupe and Gabriel were shot with two different guns?

"A. Yes.

"Q. And you are absolutely sure of that?

"A. Yes.

"Q. Is there any question in your mind at all about that?

"A. No.

"Q. Could you possibly be mistaken?

"A. No.

"Q. When you saw Miguel with the gun, did you actually see his fingers move when he pulled the trigger?

"A. Yes.

"Q. Did you see his hand move when the weapon discharged?

"A. A little bit.

"Q. So you were sure, and you are sure now, that—

"A. Yes.

"Q. (Continuing)—that Miguel shot Gabriel?

"A. Yes.

"Q. And Popo didn't shoot Gabriel at all, did he?

"A. No.

"Q. And Miguel didn't shoot Lupe at all, did he?

"A. No.

"Q. How many times did Miguel shoot Gabriel?

"A. I don't have no idea because it was real rapid.

"Q. As best you can, approximately how many times?

"A. About three times.

"Q. Do you know that or are you just guessing?

"A. You are telling me to guess. Well, ask me the question.

"Q. Is three a guess or is that a number that somebody else has told you?

"A. No.

"Q. Did somebody else tell you who shot who?

"A. No.

"Q. Now, you said the sound of the two guns was different?

"A. Yes.

"Q. And Popo had the bigger one, didn't he?

"A. Yes.

". . .

killing, was admissible under ER 803(a)(3), state of mind exception to the hearsay rule, which provides:

**HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL**

**(a)** . . .

(3) *Then Existing Mental, Emotional or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, . . .) . . .

Such statements are admissible if there is a need for their use and if there is circumstantial probability of their trustworthiness. *Raborn v. Hayton,* 34 Wn.2d 105, 208 P.2d 133 (1949); *State v. Terrovona,* 105 Wn.2d 632, 716 P.2d 295 (1986). Where, as here, there is some question of trustworthiness, the evidence is inadmissible unless there is some other corroborating evidence. Not only is the trustworthiness of the declarant in question, but also that of the witness (Mr. Martinez) who testified in court. *State v. Parr,* 93 Wn.2d 95, 99, 606 P.2d 263 (1980).

---

"Q. Can you explain that all the bullets came from one gun?

"A. Yes.

"Q. Explain it for me.

"A. About what? About the bullets?

"Q. All the bullets from the bodies of Lupe and Gabriel all came from one gun, explain that for me?

"A. No.

"Q. Serafin, is it possible that all the bullets that came from the bodies of Lupe and Gabriel all came from one gun?

"A. I understand and they had told me that before.

"Q. Who told you that?

"A. Poochie, nickname for Jesus. Poochie, it came from him. Jesus Alvarez.

"Q. Somebody else told you that?

"A. No.

"Q. Well, Serafin, which is it? Did all the bullets from the bodies of Lupe and Gabriel come from one gun or not?

"A. No.

"Q. They came from two guns?

"A. Yes.

"Q. One big one and one small one?

"A. Yes.

"Q. One that spit the bullets out the side and one that didn't?

"A. Yes."

The statement, as reported by Mr. Martinez, consisted of a threat to kill Lupe and Gabriel made by the unavailable uncharged codefendant, 30 minutes before the murders occurred. It was made to the State's chief witness, Mr. Martinez, who was impeached numerous times by defense counsel. The statement was introduced by the State as circumstantial evidence both Popo and defendant, Miguel, acted according to Popo's earlier expressed intention of killing Lupe and Gabriel. Thus, most cases where the statement is offered as an ER 803(a)(3) exception are not dispositive of the issue as it is presented here, for the content of the statement in those cases is of a nonthreatening nature. *See, e.g., Raborn.* (There the victim told her attorney she had no intention of delivering a deed to her estranged husband. The statement was offered to show the wife would not have acted in conformity with the defendant's version of the facts.)

A situation similar to this case was discussed in *State v. Parr, supra* at 99, where the court considered the admissibility of statements made by the homicide victim, 6 months prior to her death, concerning *threats* made by the defendant. The court submitted a limiting instruction which informed the jury the statement was to be considered only with respect to the state of mind of the victim, not as evidence of truth of the facts stated. In reversing the decision to admit the statement, the court extensively reviewed the ER 803(a)(3) exception as it relates to the admissibility of threats:

> But the testimony concerning a threat and other conduct of the petitioner was not properly admissible under the rule and was highly prejudicial. While this court has, in at least one case, approved the admission of similar testimony, the weight of authority is against it, and the prejudicial effect of such evidence is generally recognized. The subject is dealt with at length in many cases gathered in a scholarly opinion by Judge MacKinnon in *United States v. Brown,* [490 F.2d 758 (D.C. Cir. 1973)]. The conclusion of that opinion is stated at pages 773–74:
>
> > The rule then to be distilled from the better rea-

soned decisions is that a victim's extra–judicial declarations of fear of the defendant are admissible under the state of mind exception to the hearsay rule with a limiting instruction only if there is a manifest need for such evidence, *i.e.*, if it is relevant to a material issue in the case. Where there is a substantial likelihood of prejudice to the defendant's case in the admission of such testimony, it is inadmissible if it bears only a remote or artificial relationship to the legal or factual issues raised in the case. Even where there is substantial relevance, the additional factual matters in the statement may simply be too explosive to be contained by the limiting instruction, in which case exclusion of the testimony is also necessitated.

*Parr*, at 99–100. The court then reviewed *Shepard v. United States*, 290 U.S. 96, 78 L. Ed. 196, 54 S. Ct. 22 (1933), and quoted Justice Cardozo:

It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds.

*Shepard v. United States, supra* at 104.

*State v. Parr*, at 100–01. *See also Commonwealth v. Del-Valle*, 351 Mass. 489, 221 N.E.2d 922 (1966). As stated in *Parr*, at 102, it is the rule that evidence of threats is admissible and probative of the defendant's intent where proof is by nonhearsay. However, if proof is by testimony of a person not present in court, there is no opportunity "to explore the perceptions, motives and trustworthiness of the declarant or the circumstances surrounding the alleged quarrels or threats." *Parr*, at 102. In summary, the *Parr* court noted at page 107:

The testimony with respect to threatened violence by the defendant presents a different question. The prosecution made out a strong circumstantial case against the defendant. His defense depended largely upon his own credibility with the jury, and the circumstances did not clearly refute his story. The case being in this posture,

any evidence tending to show that the defendant was a violent person—and the hearsay statements reported by the victim's brother were the only evidence in the record to that effect—was almost inevitably highly damaging to his defense. Evidence that he had threatened the victim with violence was even more damaging, as the prosecution freely admits. It was not necessary to let this evidence go to the jury, and we cannot believe that its prejudicial effect could have been alleviated by the instruction to consider it only for a limited purpose.

*See also* DeHaven, *Evidence: State of Mind,* 16 Gonz. L. Rev. 449 (1981); *State v. Cameron,* 100 Wn.2d 520, 530–31, 674 P.2d 650 (1983).

The use of the statement made by Popo is even more tenuous with respect to Miguel's guilt. There was no limiting instruction that the statement was to be considered only as proof of the state of *Popo's* mind prior to the murders. It is disputed Miguel was present at the time the statement was made. Further, there is no evidence that, if present, Miguel was able to hear the conversation, nor did Mr. Martinez state Miguel had spoken to him at that time. Thus, under the rule announced in *Parr,* I conclude the statement is inadmissible under the "state of mind" exception to the hearsay rule.

Ultimately, the majority concludes any error was harmless because the statement was admitted late in the trial without much emphasis. Majority, at 412. A review of the transcript discloses the statement was referred to four different times, albeit toward the end of the trial. Other than evidence of the actual homicides, Popo's statement was the only other factor which connected Miguel to the scene of the crime. Thus, I conclude it was prejudicial error to admit it.

The majority also dismisses Miguel's contentions regarding prosecutorial misconduct. Given the fact his conviction was based solely on testimony offered by Mr. Martinez, any fact which related to his credibility was of critical importance to the defense. This would include the fact that at the time he was arrested as a material witness for Miguel's

trial, Mr. Martinez was charged with possession of cocaine. While the record does not indicate Miguel's counsel made a pretrial request for disclosure of information, I conclude the prosecutor's failure to apprise Miguel's counsel of the cocaine charge pending against Mr. Martinez was prejudicial. The fact a request for that specific material was not made by the defense does not lessen the prosecutor's duty to provide it, if, without the information, the defendant would be denied a fair trial. *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). *See also United States v. Bagley,* 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985) (impeachment evidence within rule); *United States v. Jenrette,* 744 F.2d 817 (D.C. Cir. 1984), *cert. denied,* 471 U.S. 1099, 85 L. Ed. 2d 840, 105 S. Ct. 2321 (1985); *Haber v. Wainwright,* 756 F.2d 1520 (11th Cir. 1985); *McCleskey v. Kemp,* 753 F.2d 877 (11th Cir. 1985). As stated in *Agurs,* 427 U.S. at 112–13:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. . . . [T]he omission must be evaluated in the context of the entire record. . . . [I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

Possible bias or prejudice on the part of the only material witness in a murder trial is a key ingredient to a fair and impartial trial. In *State v. Vavra,* 33 Wn. App. 142, 652 P.2d 959 (1982), defense counsel asked a witness whether he had made a deal to testify against the defendant. In remanding the matter to the trial court for fact–finding to determine whether there was such an agreement between the witness and the prosecutor, the court stated at page 146:

> Such an understanding or agreement between the prosecutor and the only independent critical witness which linked defendant Vavra with the actual robbery *should have been disclosed to defense counsel* for the purpose of possible impeachment. The jurors may well have found that the leniency and favoritism shown to the critical

independent witness whose testimony was required to link Vavra with the crime made him less believable, and thus it was error not to disclose the terms of this arrangement to defense counsel.

(Italics mine.) Even though there is no evidence of an agreement between the prosecutor and Mr. Martinez, all the surrounding circumstances indicate this vital information would be significant enough to explain the inconsistencies in Mr. Martinez's testimony, raising a reasonable doubt in the jury's mind as to Miguel's guilt. The record discloses Mr. Martinez was arraigned on a material witness warrant on October 22, 1984. Miguel's trial commenced October 29 and continued through November 2. On October 31, the prosecutor received a request for a warrant requesting charges be filed. Mr. Martinez was formally charged by the prosecutor on November 2. He pleaded guilty November 19, after Miguel was sentenced; the prosecutor agreed to recommend credit for time served, with no additional jail time; that sentence was imposed.

The jury's decision to believe the eyewitness testimony of Mr. Martinez, despite damaging impeachment, may have been different had they known of the pending cocaine charge against him. Mr. Martinez himself may have experienced sufficient self–imposed pressure to perform well in order to impress the prosecutor, thus hoping to receive a lighter sentence. While the prosecutor argues he was not aware of the cocaine incident until the end of the trial, he admitted he did not inform defense counsel of the charge even though the case had not yet gone to the jury. Had the defense been given the opportunity to recall Mr. Martinez as a witness, to point out to the jury the fact he would eventually face charges for possession of cocaine, the jury could have reasonably inferred, and counsel for Miguel could have argued, that Mr. Martinez had legitimate grounds to be biased in his testimony.

*State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980) requires a reversal only where, after reviewing the evidence in a light most favorable to the prosecutor, no rational trier

of fact could have found the essential elements beyond a reasonable doubt. Here, Miguel has been convicted as an accomplice to first degree murder. The record, however, does not provide sufficient evidence to support the jury's conclusion Miguel was guilty beyond a reasonable doubt, even when the evidence is viewed in a light most favorable to the prosecution. This fact, considered in conjunction with the error of admitting Popo's statement, and the probable effect upon the jury if it knew the prosecutor's primary witness was charged with a serious crime at the instant he was testifying, leaves me with the firm conviction that Miguel was denied a fair trial.

I would reverse Miguel's conviction.

Reconsideration denied October 17, 1986.

Review denied by Supreme Court January 6, 1987.