**Robert Nicholas ANGLETON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–97–00880–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 30, 1997.

Discretionary Review Granted
Jan. 21, 1998.

Stanley G. Schneider, Houston, for appellant.

Alan Curry, Houston, for appellee.

Before MURPHY, C.J., and HUDSON and FOWLER, JJ.

## OPINION

MURPHY, Chief Justice.

Appellant, Robert Nicholas Angleton, was arrested for capital murder and is confined in the Harris County jail without bond. After a proof evident hearing, the trial court denied appellant's application for habeas corpus seeking release on reasonable bail. Appellant perfected this appeal.

In five points of error, appellant complains the trial court abused its discretion in denying him bond pending trial because the State failed to meet its burden of proof that a jury would find him guilty of capital murder and answer the punishment special issues so as to invoke the death penalty. He suggests that we set bond at $100,000. Appellant also argues that, during the writ hearing, the trial court erred in admitting into evidence a tape recording that allegedly contains a conversation between appellant and his brother, Roger Angleton. Contending that the State failed to properly authenticate the recording, appellant argues the tape contains inadmissible hearsay.

### Background

On the evening of Wednesday, April 16, 1997, Doris Angleton, the complainant, dropped off her children at a softball game and went home to retrieve a forgotten bat. She never returned to the ball game. Sometime between the hours of 7:15 and 9:15 p.m., Doris was shot to death in her Houston home.

Doris's husband, the appellant, brought their children home after the game and telephoned the police when he noticed something amiss. The investigating officers found the complainant's body in a doorway between the kitchen and rest of the home. There were no signs of forced entry at the scene.

On April 28, 1997, appellant gave a statement to the police about the events of April 16. On April 29, 1997, he gave a statement in which he implicated his brother, Roger Angleton, as possibly being involved in the murder of the complainant. On July 17, 1997, the Houston police learned Roger Angleton had been arrested in Las Vegas, Nevada, on an arrest warrant out of San Diego,

California. After obtaining a court order, Houston police officers traveled to Las Vegas and recovered property found in Roger's briefcase. The briefcase contained passports, a forged driver's license, a micro-cassette tape, several typewritten notes, handwritten notes, and some $5,000.00 money wrappers in a white envelope. Roger was also in possession of $64,242.00 in cash at the time of his arrest.

On August 1, 1997, appellant was arrested for capital murder. The complaint charges appellant with employing Roger Nicholas Angleton to cause the death of Doris Angleton "for remuneration and the promise of remuneration, to wit: CASH MONEY."

Appellant filed an application for writ of habeas corpus and a motion that the trial court set bond. After a hearing on August 8, 1997, the trial court denied appellant's motion for bond and application for writ of habeas corpus.

### Proof Evident

■ The judge may deny bail in capital cases where the proof is evident. TEX. CONST. ANN. art. 1, § 11 (Vernon 1984); TEX. CODE CRIM. PROC. art. 16.15 (Vernon 1977). The term "proof is evident" means the evidence is clear and strong, leading a well-guarded and dispassionate judgment to the conclusions that 1) the offense of capital murder has been committed; 2) the accused is the guilty party; and 3) the jury will both convict the accused and will return findings requiring a death sentence. *Beck v. State*, 648 S.W.2d 7, 9 (Tex.Crim.App.1983); *Ex parte Alexander*, 608 S.W.2d 928, 930 (Tex. Crim.App.1980); *Ex parte Wilson*, 527 S.W.2d 310, 311 (Tex.Crim.App.1975); *see also Ex parte Graves*, 853 S.W.2d 701, 704 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd).

■ The burden of proof is on the State to show the proof evident. *Beck*, 648 S.W.2d at 9; *Alexander*, 608 S.W.2d at 930. The "substantial showing" burden of the accused's guilt at the bail hearing is far less than the trial burden of "beyond a reasonable doubt." *Lee v. State*, 683 S.W.2d 8, 9 (Tex. Crim.App.1985).

The State must also establish that the jury will assess appellant the death penalty. The issues the jury considers in assessing the death penalty are:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

TEX.CODE CRIM. PROC. ANN. Art. 37.071(2)(b) (Vernon Supp.1997).

If the jury unanimously answers "yes" to the above issues, it must then unanimously answer "no" to the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX.CODE CRIM. PROC. ANN. Art. 37.071(2)(e) (Vernon Supp.1997).

■ In this type of appeal, the appellate court is put in a difficult position. On one hand, we must follow the lead of the Court of Criminal Appeals "not to set out the facts in detail or comment on the sufficiency of the evidence prior to trial on the merits." *See Alexander,* 608 S.W.2d at 929; *Ex parte Wilson,* 527 S.W.2d at 311. On the other hand, while the decision of the trial judge that the proof is evident is entitled to weight on appeal, the reviewing court must review the evidence and determine whether bail was properly denied. *Alexander,* 608 S.W.2d at 930; *Ex parte Hickox,* 90 Tex.Crim. 139, 233 S.W. 1100, 1101 (1921).

### The Evidence

■ The State's case against appellant is primarily built on circumstantial evidence, "direct proof of a secondary fact, which by logical inference demonstrates the ultimate fact to be proved." *Taylor v. State,* 684 S.W.2d 682, 684 (Tex.Crim.App.1984).

### *Documents*

■ The State suggests that, as a motive for murder, complainant and appellant were in the process of getting a divorce. To support this allegation, the State introduced complainant's petition for divorce into the record. To prove appellant's involvement in the crime, the State introduced typewritten and handwritten notes found in Roger Angleton's brief case it claims link appellant to the planning and execution of Doris Angleton's murder.

Rule 901(a) of the Rules of Criminal Evidence provides that generally, when authentication or identification is necessary, the requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R.CRIM. EVID. 901(a). The problem of authentication, however, arises whenever the relevancy of any evidence depends upon its identity, source, or connection with a particular person, place, thing, or event. *See Kephart v. State,* 875 S.W.2d 319, 321 (Tex.Crim. App.1994) (quoting S. Goode, O.G. Wellborn & M.M. Sharlot, TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL Sec. 901.1, 2 Texas Practice 192 (2d Ed.1993).); *see also* TEX.R.CRIM. EVID. 104(b).

The typewritten documents were found in Roger Angleton's possession and contain specific details about the alarm code and gate code to the Angleton house, and outline a plan for a murder. The documents also trace a course of post-crime events and actions that tend to connect appellant with the murder.

### *Tape Recording*

■ The State also introduced an audio tape into evidence. The State claims the recording is a conversation between appellant and his brother in which the men osten-

sibly plan complainant's murder. Appellant contends the State has not laid the proper predicate to authenticate the tape. We agree.

■ The Court of Criminal Appeals has held that direct and circumstantial evidence 1) are to be treated in the same manner for purposes of establishing the proof required for admission of sound recordings, and 2) are of equal probative weight for purposes of determining admissibility of sound recordings. *See Cowan v. State,* 840 S.W.2d 435, 437 (Tex.Crim.App.1992); *Wallace v. State,* 782 S.W.2d 854, 857 (Tex.Crim.App.1990).

Rule 901(b) lists several non-exclusive examples of how authentication may be accomplished. Rule 901(b)(1), entitled "Testimony of witness with knowledge," provides for authentication of evidence by "[t]estimony that a matter is what it is claimed to be." This rule requires the sponsoring witness to have knowledge that the evidence is what its proponent says it is. *Kephart,* 875 S.W.2d at 321.

The State's witness, Sergeant David Ferguson, admitted that the tape presented at the hearing was not the original tape recording found in Roger Angleton's briefcase. Neither was Ferguson able to provide the court with any information as to how the offered tape differed from the original recording other than it had been "enhanced."

Ferguson attempted to authenticate the tape recording by identifying the voices on the tape as those of appellant and his brother, Roger Angleton. Rule 901(b)(5) provides for authentication by testimony in which a witness makes an "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

Because the tape contains references to an earlier alarm call at the home, the State claims the tape was made after April 10, 1997, and shortly before the murder. Officer Ferguson also testified that he had spoken with appellant and his brother on several occasions and could identify the voices on the tape as those of appellant and Roger Angleton.

On cross-examination, Ferguson admitted he did not have personal knowledge of where, how, when, or who made the tape recording. He could neither swear the tape was an accurate recording of the conversation it purported to represent, nor could he testify as to the accuracy of the equipment that made the recording. In fact, the officer offered no information about the tape other than to testify that it was an "enhanced" copy of a micro-cassette found in Roger Angleton's briefcase.

As rebuttal, appellant produced six long-time friends and acquaintances as witnesses. They all testified that they could not, beyond a reasonable doubt, identify either voice on the tape to be that of the appellant.

Before the audio tape can be properly admitted into evidence, it must be properly authenticated. The recording's relevance to this case depends whether or not it is a tape of a conversation between appellant and Roger Angleton. The State was required to furnish testimony of a witness who could verify the tape was what the State claimed it to be. In the absence of such evidence, we find the State failed to lay the proper predicate for the court to admit the tape into evidence. We sustain appellant's fourth point of error.

### Conclusion

■ After a review of the record, we cannot agree with appellant's claims that there is no evidence to support the State's contention that appellant and his brother committed the murder of Doris Angleton. However, we agree the State did not meet its burden of proof evident by producing clear and strong evidence that a jury would convict appellant of capital murder, or that the jury would answer the punishment special issues in such a way that the trial court would assess the death penalty. We sustain appellant's first and second points of error.

■ We find the trial court erred in finding "proof evident" to justify denying appellant's motion for pre-trial bail. Although

appellant has asked this court to set bond not to exceed $100,00.00, we decline.

■ Admitting an individual charged with a crime to bail balances the presumption of the accused's innocence with the State's compelling interest that the individual appear to answer the accusations against him. *See Balboa v. State,* 612 S.W.2d 553, 556 (Tex. Crim.App.1981); *see also* TEX.CODE CRIM. PROC. ANN. Art. 17.01 (Vernon Supp.1997). The amount of bail must be high enough to give reasonable assurance the accused will appear as required, but should not be oppressively high. *See* U.S. CONST. amend. VIII; TEX. CONST. Art. I, § 11,13. Nothing in the record provides this court with evidence of appellant's ability to make bail, nor is there evidence of what amount of bail would be sufficient to insure appellant's appearance. TEX.CODE CRIM. PROC. ANN. Art. 17.15 (Vernon Supp.1997). Therefore, we find the issue of pre-trial bail would be best resolved by the trial court. Appellant's third point of error is overruled.

Accordingly, we reverse and remand for a new hearing on appellant's motion for pretrial bail. TEX.R.APP. P. 43.3(a).

HUDSON, Justice, dissenting.

The Court of Criminal Appeals has promulgated rules of evidence "to govern criminal proceedings in courts of Texas." TEX. R.CRIM. EVID. 101(b). Under the plain wording of Rule 901, I believe the State has met its burden of authenticating the tape recording at issue. However, if we apply the literal holding in *Kephart v. State,* 875 S.W.2d 319 (Tex.Crim.App.1994) to the case before us, we must necessarily ignore much of Rule 901(b). Believing the Court of Criminal Appeals would not intentionally "repeal" a rule of evidence in a per curiam opinion, I am forced to discount the significance of that decision.

The facts in *Kephart,* as related in the opinions of both the court of appeals and court of criminal appeals, are that the police detained Manuel Conde and Carol King outside their motel room for possession of cocaine.[1] After obtaining a consent to search, police discovered narcotics paraphernalia, cocaine residue, and a videotape inside their motel room. The videotape contained several noncontiguous scenes, interrupted · by pauses. Although the final segment depicted Conde and King in the motel room, the beginning segments of the tape were made in the home of a third party, Deborah Kephart. Ms. Kephart appeared in the tape in varying states of sobriety and intoxication. The tape also showed Kephart sitting near a table with Conde. A white substance and a baggie of what appeared to be marihuana were visible on the table. As Conde was holding a baggie of white powder, Kephart blew her nose, and Conde said, "Getting some gal that's nosin' her coke."

When interviewed by police, Kephart admitted that Conde and King had used cocaine while in her home.[2] Kephart denied any personal use of drugs on the date in question and stated that she became intoxicated on alcohol. However, King testified as an accomplice witness for the State and said that she and Conde had gone to Kephart's home with bags of cocaine and baking soda to make crack cocaine. While there, King said Kephart used a straw to inhale some of the cocaine from a mirror. King also said that Kephart smoked some of the crack cocaine in a pipe. Both the mirror and the pipe were recovered from King's motel room, and both items were contaminated with cocaine residue. The State offered the videotape to corroborate King's testimony, and Kephart was convicted of possession of cocaine in an amount under twenty-eight grams.

On appeal, Kephart argued that the tape should not have been admitted because the State failed to lay the seven-prong predicate for the introduction of tape recordings recited in *Edwards v. State,* 551 S.W.2d 731 (Tex. Crim.App.1977).[3] The court of appeals af-

---

1. *See Kephart v. State,* 888 S.W.2d 825, 828 (Tex. App.—San Antonio 1993), rev'd, 875 S.W.2d 319 (1994).

2. Later, in a written statement, Kephart referred to the substance only as a "white powder." ·

3. Prior to the adoption of the Texas Rules of Criminal Evidence the authentication of audio tapes was governed by the seven-prong test set forth in *Edwards v. State,* 551 S.W.2d 731, 733 (Tex.Crim.App.1977). The predicate for admissi-

firmed the conviction and concluded that "because the videotape was not made by law enforcement personnel, the usual predicate is not applicable." *Kephart*, 888 S.W.2d at 827–28. On discretionary review, the Court of Criminal Appeals observed that the predicate for admission of a tape recording is now controlled by Rule 901 of the Rules of Criminal Evidence. The Court further held that nothing in Rule 901 lessens its applicability simply because the tape recording was not made by law enforcement personnel. Under Rule 901(b)(1), the Court held the State was required to produce a sponsoring witness who could testify "that the evidence is what its proponent says it is." *Kephart*, 875 S.W.2d at 321. Because the State's sponsoring witness "had no personal knowledge of where or when the tape had been made, [and] he could not ... state that the tape accurately represented the actual scene or event at the time it occurred," the Court of Criminal Appeals held the tape was inadmissible and reversed the conviction. *Kephart*, 875 S.W.2d at 322–23.

On its face, *Kephart* suggests that the Court of Criminal Appeals has concluded that the proponent can never authenticate a tape recording without the testimony of a sponsoring witness who is either (1) the maker of the tape or (2) was otherwise a participant in the recorded conversation. This construction is contrary to the plain wording of the rule. Rule 901 provides that authentication can be satisfied by any "evidence sufficient to support a finding that the matter in question is what its proponent claims." The rule does not *require* authentication by the testimony of a witness with knowledge, but merely suggests for purposes of illustration

that this is one method of authentication.[4] In fact, Rule 901(b) recites nine examples of authentication that *do not* rely upon the testimony of a witness with knowledge. One method of authentication expressly provided by the rule, but ignored in *Kephart*, is by circumstantial evidence, *i.e.*, "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tex.R. Civ. Evid. 901(b)(4).

As an intermediate appellate court, we are bound by the decisions of the Court of Criminal Appeals. However, I believe the court meant only to hold that a tape recording must be authenticated *regardless of whether it was made by law enforcement personnel.* While it is unfortunate that the *Kephart* opinion focused on only one of the ten illustrations set forth in Rule 901(b), I doubt the court intended by that omission for us to ignore all other methods of authentication illustrated by the rule. It is significant that apart from *Kephart*, the court has had no occasion to consider the issue of whether authentication of tape recordings can be established by circumstantial evidence. While recognizing the intermediate status of this Court, I do not believe that *stare decisis* compels us to pursue poor draftsmanship down a path the Court of Criminal Appeals has not fully explored and did not intend us to follow.

While the *Kephart* opinion did not discuss authentication by circumstantial evidence, other courts have readily endorsed this method. *See State v. Lavers*, 168 Ariz. 376, 814 P.2d 333, 343–46, *cert. denied*, 502 U.S. 926, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991)

bility required the proponent to make: "(1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement." *Edwards*, 551 S.W.2d at 733.

However, because the adoption of the Texas Rules of Criminal Evidence superseded the *Edwards* test, it is no longer needed as an authorita-

tive guide for admissibility of electronic sound recordings. *Leos v. State*, 883 S.W.2d 209, 211 (Tex.Crim.App.1994). The authentication of a tape recording is now governed by Rule 901 of the Rules of Criminal Evidence which states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Stapleton v. State*, 868 S.W.2d 781, 786 (Tex.Crim.App.1993).

4. Rule 901(b) sets forth 10 examples of authentication "[b]y way of illustration only, and not by way of limitation."

(tape recording of double murder made by one of the victims was circumstantially authenticated under Rule 901 by physical evidence that the manner of death was consistent with the events heard on the tape); *People v. Berkey,* 437 Mich. 40, 467 N.W.2d 6, 9–13 (1991) (where victim recorded conversations with ex-husband shortly before he successfully paid another to kill her, the tapes were authenticated under Rule 901 merely by the identification of the voices alone). *Also United States v. Bright,* 630 F.2d 804, 820 (5th Cir.1980) (tape made by a police informant who died before trial was authenticated by circumstantial evidence under the four-prong test of *United States v. Biggins,* 551 F.2d 64 (5th Cir.1977)); [5] *United States v. O'Connell,* 841 F.2d 1408, 1419–22 (8th Cir.1988) (tape seized by police during execution of search warrant was properly authenticated by circumstantial evidence under the seven-prong test of *United States v. McMillan,* 508 F.2d 101 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975) which contains the same elements as the *Edwards* test); *State v. Smith,* 85 Wash.2d 840, 540 P.2d 424, 428–29 (1975) (tape made by murder victim was circumstantially authenticated under an *Edwards* type test).

I believe that under the facts presented here, the tape recording at issue was sufficiently authenticated by circumstantial evidence. The State established that on February 7, 1997, Doris Angleton filed a petition for divorce against her husband, the appellant. She alleged within the petition that appellant maintained a large amount of cash in safe deposit boxes of four different banks. In an attached affidavit, Ms. Angleton said, "I fear that once he learns I have filed this divorce petition, that he will empty these safe deposit boxes and I will have no record nor any ability to prove that such cash ever existed." The petition contained a request for a temporary restraining order to prevent appellant from entering the safe deposit boxes during the pendency of the divorce action.

Two months later, on Wednesday, April 16, 1997, Ms. Angleton was murdered.

In a sworn statement, appellant said that as the manager of a girls softball team, he was warming up for a game at the West University Little League Field, when he realized he had forgotten his daughter's bat. At approximately 7:15 p.m., appellant asked his wife if she would bring the bat up to the field. Ms. Angleton left for home, but did not return to the game. Appellant claims that after the game, he took his girls home. He entered the driveway and parked the car, but immediately noticed that the back door was open. Appellant did not enter the house, but summoned the police. After the police arrived, they discovered Ms. Angleton's body in the kitchen doorway. Police could find no sign of a forced entry into the residence. During subsequent questioning, appellant told police that he was a bookmaker, that his brother, Roger Angleton, had worked for him in the bookmaking business, and that his brother might have had a motive for killing the victim.

On June 22, 1997, Roger Angleton was arrested by Las Vegas police on an unrelated California warrant. He was, at the time of his arrest, in possession of a microcassette tape, notes, a forged driver's license, passports, and over $64,000 in cash. Sergeant Ferguson testified that on July 17, 1997, he became aware that Roger Angleton had been arrested. After learning that the Las Vegas police were still in possession of his personal property, Ferguson flew to Las Vegas on July 22, 1997, where he recovered Roger Angleton's briefcase pursuant to a court order. After returning to Houston, Ferguson obtained a search warrant authorizing him to listen to the microcassette found inside the briefcase. Based upon conversations with both Robert and Roger Angleton, Ferguson identified the voices of both men on the microcassette. Ferguson also testified that he made no alterations or deletions in the microcassette tape.

---

**5.** "While it is admittedly better to have a tape recording authenticated by a witness who was privy to the conversation as the tape was made, we recognize that is not always possible. When circumstantial evidence is necessary to authenticate the accuracy of the recording, the court must be exacting in its requirements." *Bright,* 630 F.2d at 820.

At the bail hearing, the State introduced an "enhanced" copy of the tape. Sergeant Ferguson testified that he had listened to both the original microcassette and the enhanced copy. Although the recording expert who "enhanced" the copy was not called as a witness, Ferguson testified that other than a reduction in the background noise, he could discern no audible difference between the original microcassette and the enhanced copy.[6]

Although the voices on the tape are sometimes inaudible, the two men can clearly be heard discussing the planned murder of a woman. They refer to a typewritten list and at times sound as though they are reading from a list. Some of the phrases are identical to those found in cryptic notes seized from Roger Angleton's briefcase. According to the plan, Roger agrees to enter the house and disarm the alarm using the code 00032.[7] Appellant instructs Roger in how to arm the alarm and remain outside the detection path of the motion sensors by waiting in the kitchen. Roger states that he intends to use an untraceable weapon with a laser sight to make the hit. As soon as the woman enters the house and disarms the alarm, Roger states that he will shoot her rapidly three times to take her down, and that once she is down, he will finish her. The men also talk about what measures should be taken to make it appear the woman was killed when she surprised a burglar. Appellant suggests, therefore, that she not be shot in the back. Roger states that he would prefer not to rummage the house. The men also discuss various contingencies that might arise which could alter the planned execution. The conversation ends abruptly in a manner that suggests the recorder stopped before the conversation was concluded.

The typewritten notes contain clipped phrases that suggest a murder for hire. Retaining the same grammatical errors that appear in the original, the following ominous remarks are found in the notes: "ENTER ABOUT 8:15–30 via gate and back side door"; "disarm system · 00032"; "wait in kitchen"; "subject comes home, hit immediately if with either girl leave via back entrance"; "rummage house plus watch prob no ring unless off in dish in bathroom"; "leave via back entrance, tape and break window for entrance, leave door open?"; "leave gate open or leave sign in front of house that is done"; "(can page you with code that is done)"; "point of hit to leave 3 minutes"; "if not gong to game, page signal"; "preference thursday or following or following Wednesday"; "Monday possible if you can get her temporarily out of house"; "money 125,000"; "October 20 or so 100,000 and 1000, 000 thereafter annualized in October until 2005 ( less 12,000 advanced"; "if arrested keeping paying to designee"; "on future money have to work with me as to when and where"; "will send future vendetta letter which will clinch"; "MY CONTRACT WITH YOU IS THE KILL AND NO SQUEELING, IF KILLED CUT MONEY TO DESIGNATED PARTIES. THE METHOD DESIGNED BY ME IS TO GIVE YOU ALIBI AND AND PERMIT POLICE TO FOCUSE ON ME."

Authentication is established here by circumstantial evidence. The State established a motive for the murder. The execution was accomplished in a manner that is largely consistent with the plan outlined on the tape: (1) Doris Angleton was killed in the kitchen; (2) she had multiple gunshot wounds to the chest and head; (3) the house was not ransacked; (4) there was no sign of forced entry; (5) and the back door was left open.

The voices of Roger and Robert Angleton were identified on the tape. Sergeant Ferguson testified that no additions or deletions were made after he acquired the tape. Moreover, the systematic nature of the conversation and the steady background noise suggest that the tape was not selectively stopped and started during its making.

Further, the alarm code discussed on the tape was the correct code for appellant's

---

**6.** While it would have been preferable for the State to offer testimony regarding how the background noise was reduced, the probative value of the recording rests upon the words spoken, not on the presence or absence of background noise.

**7.** Appellant admitted to police that the alarm code for his home was 00032.

home at the time of his wife's death. There is some evidence of guilty knowledge in that when appellant saw the back door of his home was open, he apparently made no attempt to enter the house, investigate the reason for the open door, or even call out his wife's name. Finally, in a case of murder for hire, it might reasonably be expected that the trigger man would want to retain some incriminating evidence to guarantee full payment after completing the murder. The tape, along with the notes, were found in Roger Angleton's possession. The tape is clearly a statement against penal interest which significantly enhances its authenticity. Under the circumstances presented here, the trial court did not err in considering the tape recorded statement when deciding whether to deny bail.

Bail may be denied for capital offenses when the State makes a satisfactory showing that "the proof is evident." TEX. CONST. art. I, § 11. The term "proof is evident" means evidence clear and strong, leading a well guarded judgment to the conclusion that an offense was committed, that the accused is the guilty agent and that he would probably be punished by the death penalty if the law is administered. *Beck v. State,* 648 S.W.2d 7, 9 (Tex.Crim.App.1983). Because I believe the proof is evident in this cause, I respectfully dissent.

FOWLER, Justice, concurring.

I find myself in a disconcerting position because I agree with every single statement in the dissenting opinion, and yet, I am obligated to join in the majority opinion. As both the majority and dissenting opinions explain, the ultimate issue before us is how can the State authenticate an audiotape—which appears to have been made by one of two co-defendants during the planning of the murder of one of the co-defendant's wives—when the defendants refuse to acknowledge either the planning session or the recording of it. *See* TEX.R. EVID. 901.

The majority opinion concludes that the contents of the tape could not be introduced as evidence because a per curiam opinion of the Court of Criminal Appeals, *Kephart v.*

*State,*[1] holds that the only way a video or audio tape can be properly authenticated and thereby introduced is if the proponent for the introduction of the tape has personal knowledge (1) of where or when the tape was made and therefore (2) that the "tape accurately represented the actual scene or event at the time it occurred." *Kephart,* 875 S.W.2d at 322–323. I agree with this conclusion of the majority.

The dissenting opinion argues that the Court of Criminal Appeals has through the per curiam *Kephart* opinion effectively repealed part (b) of rule 901 of the rules of criminal evidence. The dissenting opinion also argues that the State presented enough evidence to sufficiently authenticate the tape because the State identified the voices on the tape as the defendants', and presented circumstantial evidence connecting the discussion to the murder. *See,* dissenting opinion *supra; see also, United States v. Bright,* 630 F.2d 804, 820 (5th Cir.1980); *State v. Lavers,* 168 Ariz. 376, 814 P.2d 333, 343–45 (1991). I agree with both of these arguments.

But, in spite of my agreement with the dissent, I must join the majority. The Court of Criminal Appeals promulgated this state's rules of criminal evidence. *See* TEX. GOVT. CODE § 22.109 (giving the court rulemaking power in the promulgation of rules of evidence to be used in criminal cases). Likewise, the Court of Criminal Appeals has ultimate say in the interpretation of the rules of evidence, and, as an intermediate appellate court, we are bound to follow its pronouncements. Through *Kephart,* the court has stated that a tape can be authenticated *only* by someone with personal knowledge of where or when the tape was made, because, without personal knowledge, one cannot state the tape accurately represents the actual scene or event at the time it occurred. *Kephart,* 875 S.W.2d at 322. The effect of *Kephart,* intended or not, is to prevent the State from introducing an audiotape containing a conversation between two defendants if neither of the defendants acknowledges that the tape accurately recorded their conversation. *See id.* It would also prevent the State from

1. 875 S.W.2d 319, 322–323 (Tex.Crim.App.1994).

introducing an audiotape made by a complainant who later died, even though evidence indicates the reliability and accuracy of the tape. *See id; compare State v. Lavers,* 814 P.2d at 343–45 (holding that State could introduce tape made by deceased complainant during deadly assault because the tape recorded events confirmed by other circumstantial evidence of the crime.). If that is what the court intended, then the court should explain the purpose and intended uses of part (b) of rule 901.[2] If that result was not intended, the court must correct the confusion the per curiam opinion has created. Regardless of which position it takes, the court is responsible for clearing up the apparent conflict between the *Edwards*[3] seven part test and part(b) of rule 901.

For these reasons, I join in the majority opinion and yet choose to write separately.

**2.** For example, one monograph on the Texas Rules of Evidence states the following about part (b) of rule 901:

> While the ten subdivisions of Rule 901(b) are illustrative and not limiting, they are in aggregate so comprehensive—especially with the general language in subdivision (b)(1) on testimony that a matter "is what it is claimed to be" and subdivision (b)(4) on "distinctive characteristics" and "circumstances"—that it is hard to envision a reasonable form of authenticating proof that would not be embraced by these illustrations.
> 2 Steven Goode, et al., Texas Practice, Guide to the Rules of Evidence: Civil and Criminal 194 (2D ED.1993), (*CITING* 5 David Louisell & Christopher B. Mueller, Federal Evidence § 506, AT 24 (1981)).

**3.** *Edwards v. State,* 551 S.W.2d 731 (Tex.Crim. App.1977).