# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47205-8-II |
| Respondent, | PART PUBLISHED OPINION |
| v. | |
| JOHN GARRETT SMITH, | |
| Appellant. | |

BJORGEN, C.J. — Following a bench trial, the trial court found John Garrett Smith guilty of second degree attempted murder and second degree assault, each with a domestic violence sentencing enhancement. He appeals these convictions and the enhancements, arguing that the trial court erred when it ruled that a voice mail recording containing part of a domestic dispute between him and his spouse, Sheryl Smith, was admissible and not in violation of Washington's privacy act, RCW 9.73.030. He also raises myriad arguments in his statement of additional grounds (SAG).

In the published portion of this opinion, we hold that the trial court erred in admitting the voice mail recording because its contents contained a private conversation that was recorded without the parties' consent. Because the trial court specifically relied on that recording to find

John[1] guilty of second degree attempted murder, its erroneous admission was prejudicial to that conviction. However, the improper admission of the recording had no prejudicial effect on the second degree assault conviction. Accordingly, we reverse and remand John's second degree attempted murder conviction and affirm his second degree assault conviction.

In the unpublished portion of the opinion, we address and reject John's SAG claims.

FACTS

John and Sheryl married in 2011 and lived in Vancouver with Sheryl's daughter, Skylar Williams. On June 2, 2013, John and Sheryl were in their residence drinking. They became intoxicated and began to argue, which prompted Williams to leave the house. While Sheryl and John were alone, John began to beat and strangle Sheryl, who lost consciousness due to the strangling.

Sometime during the attack, John used the residence's landline telephone to try to locate his cell phone. Unable to do so, he was unaware that his actions activated his cell phone's voice mail function, which started recording part of the dispute. In that recording, John is heard yelling insults at Sheryl and demands related to locating his cell phone. Sheryl responded to these statements by screaming unintelligibly or asking him to stop or leave her alone. At one point during the recording, Sheryl tells John to "[g]et away," to which he responds, "No way. I will kill you." Report of Proceedings (RP) at 241-43.

---

[1] For clarity, we refer to John Smith and Sheryl Smith by their first names. No disrespect intended.

Shortly after the voice mail was recorded, John left the residence. Sheryl called 911 and reported that John had beaten her. During the 911 call, Williams returned home and saw that Sheryl's head was bloodied and swollen. Ly Rota Yong, a police officer with the Vancouver Police Department, arrived at the residence, and Sheryl was transported to the hospital. At some point after Williams arrived home, she retrieved John's cell phone and listened to the voice mail. At the hospital, Williams played the voice mail recording for Yong, who took the phone into possession.

John was later arrested and charged with first degree attempted murder (domestic violence), second degree attempted murder (domestic violence), first degree assault (domestic violence), and second degree assault (domestic violence).

Before trial, John moved to suppress the cell phone voice mail recording based on RCW 9.73.030. The trial court held a CrR 3.6 hearing, denied his motion, and entered findings of fact and conclusions of law. Pertinent to his assignments of error on this appeal, the trial court made the following conclusions of law:

> 7. RCW 9.73.030(1)(a) does not apply to this case because the people in the room where the recording took place, [Sheryl] and [John], were not attempting to communicate by electronic means. Neither party attempted to communicate by electronic means.
>
> 8. RCW 9.73.030(1)(b) applies when two people are having a private, non-electronic, conversation and a third party attempts to record or intercept that conversation.
>
> 9. RCW 9.73.030(1)(b) does not apply to this case because this information was recorded by [John]'s phone inadvertently. At the time this information was recorded, nobody was trying to intercept or record what was occurring.
>
> . . . .

11. At the time [Williams] discovered the phone and opened it, neither of the activities prohibited by RCW 9.73.030 were taking place. [Williams] was not violating that statute when she opened the phone and listened to its contents.

. . . .

13. None of the information that was gathered up until the point that Officer Yong listened to the phone recording was gathered illegally.

Clerk's Papers (CP) at 92-93.

At John's bench trial, he, Sheryl, Williams, several police officers, and expert witnesses testified. The recorded voice mail, 911 phone calls, and photographs of Sheryl's injuries were admitted into evidence. The trial court entered findings of fact and conclusions of law, finding John guilty of second degree attempted murder and second degree assault, both with domestic violence enhancements.[2] The trial court found that the convictions merged, so it sentenced him only on the second degree attempted murder conviction.

John appeals.

ANALYSIS

I. PRIVACY ACT VIOLATION

1. Standard of Review and Legal Principles

John does not challenge any of the trial court's findings of fact related to the CrR 3.6 hearing, and unchallenged findings are deemed verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). He does challenge several of the trial court's conclusions of law,

---

[2] The trial court acquitted John of his charges for first degree attempted murder and first degree assault.

4

which we review de novo. *State v. Roden*, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014). We review

conclusions of law to determine whether they are legally correct and whether they are supported

by the findings. *State v. Cole*, 122 Wn. App. 319, 323, 93 P.3d 209 (2004); *see McCleary v. State*,

173 Wn.2d 477, 514, 269 P.3d 227 (2012).

Washington's privacy act, chapter 9.73 RCW, is "one of the most restrictive electronic

surveillance laws ever promulgated," significantly expanding the minimum standards of its

federal counterpart and offering a greater degree of protection to Washington residents. *Roden*,

179 Wn.2d at 898. RCW 9.73.030 provides in pertinent part,

> (1) Except as otherwise provided in this chapter, it shall be unlawful for any individual, . . . to intercept, or record any:
>
> (a) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication;
>
> (b) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation.

"Any information obtained in violation of RCW 9.73.030 . . . shall be inadmissible in any civil or

criminal case." RCW 9.73.050.[3]

---

[3] RCW 9.73.030(2) allows the recording of certain communications or conversations with the consent of one party to the conversation, including those of an emergency nature or which convey threats of bodily harm. *State v. Caliguri*, 99 Wn.2d 501, 506, 664 P.2d 466 (1983). Because neither John nor Sheryl consented to this recording, this provision does not apply to the circumstances presented.

2.     Private Communication

John assigns error to conclusion 7 from the trial court's CrR 3.6 ruling, in which it ruled that RCW 9.73.030(1)(a) did not apply. In this, the trial court was correct.

Unequivocally, RCW 9.73.030(1)(a) requires a "[p]rivate communication *transmitted by telephone, telegraph, radio, or other device* between two or more individuals." (Emphasis added.); *see also Roden*, 179 Wn.2d at 898-900 (text messages between two cell phones); *State v. Christensen*, 153 Wn.2d 186, 191-92, 102 P.3d 789 (2004) (telephone calls); *State v. Townsend*, 147 Wn.2d 666, 672, 57 P.3d 255 (2002) (e-mails, instant messaging). The unchallenged findings 1 and 2 and the evidence supporting them show that the voice mail feature recorded John and Sheryl communicating in person. They were not attempting to communicate through any device that would make the voice mail recording subject to RCW 9.73.030(1)(a). Accordingly, we hold that the trial court did not err in concluding that RCW 9.73.030(1)(a) was inapplicable.

3.     Private Conversation

John raises three issues related to the trial court's conclusions 8, 9, 11, and 13 pertinent to RCW 9.73.030(1)(b): (1) whether the recorded voice mail's contents are a conversation; (2) if the contents are a conversation, whether it was private; and (3) if a private conversation, whether it was recorded or intercepted. For the following reasons, we hold that John recorded a private conversation in violation of RCW 9.73.030.

A.  Conversation

To begin with, the parties dispute whether the contents of the recorded voice mail are a conversation under RCW 9.73.030(1)(b). Because the privacy act does not define

6

"conversation," we may use a dictionary to discern the plain meaning of that term. *Newton v. State*, 192 Wn. App. 931, 937, 369 P.3d 511, *review denied*, ___ P.3d ___ (2016). *Webster's Third New International Dictionary* 498 (2002), defines "conversation" in pertinent part as an "oral exchange of sentiments, observations, opinions, ideas: colloquial discourse."

However, the State contends that *State v. Smith*, 85 Wn.2d 840, 540 P.2d 424 (1975) complicates this dictionary definition. In *Smith*, the Washington Supreme Court held that the trial court did not err in admitting a tape that had recorded the moments immediately before Nicholas Kyreacos, the victim, was killed. *Id.* at 842-43, 846-47. Kyreacos was wearing a device to record his encounter with the defendant. *Id.* at 843. The recording begins with Kyreacos observing his surroundings while walking to meet with the defendant. *Id.* at 844. After Kyreacos' statement that "[e]verything looks quite normal," the *Smith* court described the pertinent contents of the tape recording in the following terms:

> Then, suddenly are heard the sounds of running footsteps and shouting, the words "Hey!" and "Hold it!", Kyreacos saying "Dave Smith," and a sound resembling a gunshot. The running stops, and Smith tells Kyreacos to turn around. Kyreacos asks, "What's the deal?" Smith replies, "You know what the deal is. I'll tell you one thing baby, you have had it."
> Several more words are exchanged, not all of which are clearly intelligible, about whether Smith has "a charge." Then Kyreacos asks, "If you wanted me, why didn't you come to see me?" Smith replies, "I'll tell you why." A moment later, another shot is heard. The quality of the recording becomes "tinny." (There was expert testimony that this shot damaged the microphone.) Then Kyreacos, screaming, repeatedly begs for his life. More shots are fired. There is a slight pause, two more shots are heard, then certain unclear sounds, then silence. After a period of nearly complete silence, a voice is heard to say, "We've already called the police." Another voice says, "Hey, I think this guy's dead, man." Afterward, the tape records police sirens and the sounds of the officers investigating.

*Id.* at 844-45. Based on this recording, the *Smith* court held that

> the material recorded was clearly "private conversation" within the simple meaning of that term. However, the special circumstances of the present case compel us to

arrive at a different result. We are convinced that the events here involved do not comprise "private conversation" within the meaning of the statute. Gunfire, running, shouting, and Kyreacos' screams do not constitute "conversation" within that term's ordinary connotation of oral exchange, discourse, or discussion. We do not attempt a definitive construction of the term "private conversation" which would be applicable in all cases. We confine our holding to the bizarre facts of this case, and find that the tape does not fall within the statutory prohibition of RCW 9.73.030, and thus its admission is not prohibited by RCW 9.73.050.

*Id.* at 846-47.

The *Smith* court made clear that it was confining its holding to its specific facts and that its definition of "conversation" was not applicable in all cases. Because of its *sui generis* nature, *Smith* has little bearing on the case before us. Nevertheless, the State argues that the contents of the voice mail recording here are legally indistinguishable from and as unique as the recording in *Smith*. We disagree.

Unlike *Smith*, there was a much greater oral exchange of words and sentiments between John and Sheryl. Examples within the voice mail recording include: (1) John calling Sheryl a "[f]at [b]itch" and Sheryl responding, "Stop"; (2) John asking, "Where is my phone?" and Sheryl screaming, "Look what you have done to me!"; and (3) John telling Sheryl, "I will kill you" to which Sheryl responds, "I know." RP at 241-43. In this final example's complete context, the exchange particularly shows a clear dialogue between the two individuals:

| John: | You think you're bleeding?. . . . You're the most fucked up person. Give me back the phone. |
| Sheryl: | Get away. |
| John: | No way. I will kill you. |
| Sheryl: | I know. |
| John: | Did you want to kill me? Give me back my phone. |
| Sheryl: | No. Leave me alone. |

RP at 241-43. These examples from the voice mail recording are unmistakably verbal exchanges falling within the definition of conversation.

8

We agree with the State, that similar to *Smith*, some parts of the recorded voice mail may fall outside the definitional scope of conversation, particularly Sheryl's unintelligible screams. Standing alone, Sheryl's screams would not constitute a conversation. However, these screams were responsive to statements that John was making to Sheryl and were scattered throughout the entire dispute, which contained repeated verbal exchanges between the two individuals as outlined above. Within this context, Sheryl's screams serve as an expression of sentiments responsive to John's yelling and thus constitute part of a conversation.[4]

For the above reasons, the contents of the recorded voice mail constituted a conversation under RCW 9.73.030(1)(b).

B. Private

Both parties dispute whether the conversation between John and Sheryl was private under RCW 9.73.030(1)(b). For the following reasons, we hold that the conversation was private.

"A communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable." *Kipp*, 179 Wn.2d at 729. In determining a subjective intention of privacy, a party does not need to explicitly state such an intention during the conversation; rather, it can be inferred from the facts and circumstances of the specific case. *Id.* In ascertaining whether an expectation of privacy is reasonable, we examine the following factors: duration and subject matter of the conversation, the location of the conversation, the presence or potential presence of third parties at the conversation, and the role of the nonconsenting party and his or her relationship to the consenting party. *Id.* As with subjective

---

[4] We note that even if the screams themselves were not deemed to be conversation, their presence would not affect the status of the remaining verbal exchange as conversation.

intent, "[t]he reasonable expectation standard calls for a case-by-case consideration of all the facts." *Id.* Because the trial court's CrR 3.6 findings of fact are undisputed, we review de novo whether the conversation was private. *Id.* at 722-23.

Here, a domestic dispute occurred between two married persons in the privacy of their home. The dispute did not occur until Williams left, which signals a subjective intention and reasonable expectation that the conversation would be private. *Id.* at 729-31. Of the factors set out above, the location of the conversation, the relationship between the parties, and the absence of third parties all declare the privacy of the conversation. None of the considerations in *Kipp* dispute its privacy. On these facts, we hold that John had a subjective intention and reasonable expectation that the conversation with Sheryl would be private.

C. Recording and Interception

Finally, related to conclusions 8, 9, 11, and 13, John contends that the trial court erred in ruling that the conversation was not recorded or intercepted.

In conclusion 11, the trial court ruled: "At the time [Williams] discovered the phone and opened it, neither of the activities prohibited by RCW 9.73.030 were taking place. [Williams] was not violating that statute when she opened the phone and listened to its contents." CP at 93. In this, the trial court was correct. Williams did not record or intercept John's conversation when she merely opened his phone and played the voice mail for the police. John himself was the one who enabled the device to record the private conversation. Williams may have accessed a device that happened to record or intercept a conversation, but John was the one who recorded the conversation. Thus, the trial court did not err in concluding that Williams did not record or intercept the conversation.

In conclusion 8, the trial court ruled that "RCW 9.73.030(1)(b) applies when two people are having a private, non-electronic, conversation *and a third party* attempts to record or intercept that conversation." CP at 92 (emphasis added). The trial court erred in this conclusion.

RCW 9.73.030(1) by its plain language imposes its restraints on "any individual" without limitation to those not participating in the conversation. A broad and literal reading of this plain text is in step with the Supreme Court's characterization of our privacy act as requiring the consent of *all* parties to a private conversation. *Kipp*, 179 Wn.2d at 725. Further, although no case has held so directly, the case law has implied that no third party is required to record a conversation, i.e., a party to a private conversation can also be the person who impermissibly records the conversation. *Kipp*, 179 Wn.2d at 723; *Smith*, 85 Wn.2d at 843, 846-47; *State v. D.J.W.*, 76 Wn. App. 135, 139, 142, 882 P.2d 1199 (1994), *aff'd and remanded sub nom. by State v. Clark*, 129 Wn.2d 211 (1996). Thus, John's recording of this conversation can violate the privacy act, even though he was a party to it.

In conclusion 9, the trial court ruled that

> RCW 9.73.030(1)(b) does not apply to this case because this information was recorded by [John]'s phone *inadvertently*. At the time this information was recorded, nobody was trying to intercept or record what was occurring.

CP at 92 (emphasis added). The trial court also erred in this conclusion.

Whether John inadvertently or purposely recorded himself is beside the point; the statute requires no specific mental state for a person to improperly record a conversation. *Lewis v. Dep't of Licensing*, 157 Wn.2d 446, 465, 139 P.3d 1078 (2006); *Haymond v. Dep't of Licensing*, 73 Wn. App. 758, 762, 872 P.2d 61 (1994). Although some cases involve a person who is both a party to a conversation and intentionally or knowingly records his or her own conversation, *e.g.*,

*Kipp*, 179 Wn.2d at 723, nothing in the plain language of RCW 9.73.030 imposes such a requirement. We are unwilling to risk compromising the scope of the privacy act by the doubtful implication of a mental state requirement from language saying nothing about a mental state. Therefore, the trial court erred by holding that John's inadvertence in recording the private conversation removed his actions from the reach of the privacy act.

In conclusion 13, the trial court ruled that "[n]one of the information that was gathered up until the point that Officer Yong listened to the phone recording was gathered illegally." CP at 93. Because John recorded a private conversation without Sheryl's consent, the trial court erred in this conclusion.[5]

For these reasons, the trial court erred in conclusions 8, 9, and 13 and by admitting the voice mail recording at John's trial.

4.      Prejudice

Having concluded that the recorded voice mail was improperly admitted, we next turn to whether its admission was prejudicial to John's trial.

> Failure to suppress evidence obtained in violation of the [privacy] act is prejudicial unless, within reasonable probability, the erroneous admission of the evidence did not materially affect the outcome of the trial.

*Christensen*, 153 Wn.2d at 200 (citation omitted). If the erroneous admission of evidence was prejudicial, we reverse. *State v. Courtney*, 137 Wn. App. 376, 383-84, 153 P.3d 238 (2007).

---

[5] Because we conclude that John recorded the conversation in violation of the privacy act, we need not decide whether his actions also constituted an interception of the same conversation under the act.

The trial court clearly relied on the voice mail recording in determining that John formed the intent to kill Sheryl, which was part of its basis for finding him guilty of second degree attempted[6] murder.[7] The trial court found:

> 4.1 [John] formed the intent to kill [Sheryl] and is heard telling [Sheryl] that "I will kill you" and then proceeds to beat her in the head and strangle her.
> . . . .
> 4.4 In the moment when [John] told [Sheryl], "I am going to kill you," the Court finds beyond a reasonable doubt that killing [Sheryl] was his exact intent. [John] did not say this because he was angry at [Sheryl], or for some other reason. He said it because he meant it.

CP at 86. Given these findings, we cannot say within reasonable probability that the trial court would have found John guilty of second degree attempted murder if the voice mail recording had been suppressed.

On the other hand, nothing in the trial court's findings supporting the second degree assault conviction suggest that it relied on the voice mail recording. The voice mail was merely cumulative evidence supporting that conviction, considering that several witnesses testified to Sheryl's injuries and corroborating pictures were admitted into evidence.

Accordingly, we reverse and remand the second degree attempted murder conviction,[8] but affirm the second degree assault conviction.

---

[6] "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1)

[7] "A person is guilty of murder in the second degree when: (a) [w]ith intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person." RCW 9A.32.050(1)(a).

[8] John does not argue in his briefing that the evidence of the second degree murder conviction is insufficient without the recording. In his SAG, he asks that the conviction be dismissed with prejudice, but only as the bare conclusion of his argument that the recording should be

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

## II. SAG

In the unpublished part of this opinion, we examine and reject John's SAG claims. We do not address his arguments related to the second degree attempted murder conviction, since we are reversing that conviction on other grounds.[9] However, we analyze his contentions (1) that there is not substantial evidence to support the trial court's finding 6.1, which determined Sheryl had been strangled into unconsciousness; (2) that the State suppressed favorable and material evidence in violation of *Brady*;[10] (3) that the trial court erred in sustaining the State's objections to testimonial evidence related to Sheryl's financial motive; (4) that the State committed prosecutorial misconduct when the prosecutor disclosed at a pretrial conference that the attorney general's office was investigating John; and (5) that the trial judge was biased and failed to disclose that he sat in a prior, unrelated case involving Sheryl. For the reasons discussed below, we hold that all these claims fail.

---

suppressed. Therefore, consistently with *Christensen*, 153 Wn.2d at 201, we reverse and remand.

[9] Thus, we do not address his arguments (1) that the trial court made contrary rulings in its conclusions related to first degree assault, of which John was acquitted, and second degree attempted murder, which we reverse; and (2) that the trial court did not give appropriate weight to the autism evidence as it related to his ability to form the intent to kill Sheryl. We also do not readdress his contention related to the trial court's error in admitting the recorded voice mail message under RCW 9.73.030, since we already examined that issue in the published portion of this opinion.

[10] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

1.      Substantial Evidence of Strangulation and Loss of Consciousness

John argues that the trial court's finding 6.1, to the extent it determined that he strangled Sheryl to unconsciousness, is not supported by substantial evidence.[11]  We disagree.

Generally, to determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any reasonable juror could have found the elements of the crime beyond a reasonable doubt.  *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014).  Following a bench trial, "appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law."  *Id.* at 105-06.  "Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise."  *Id.* at 106 (internal quotation marks omitted).  "We treat unchallenged findings of fact and findings of fact supported by substantial evidence as verities on appeal."  *Id.*  "We review challenges to a trial court's conclusions of law de novo."  *Id.*

"In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it."  *Id.*  "These inferences 'must be drawn in favor of the State and interpreted most strongly against the defendant.'"  *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).  Further, we defer to the

---

[11] In his SAG, John challenged all the trial court's findings related to its determination that he had strangled Sheryl into unconsciousness.  However, we do not address the trial court's findings 4.1 and 4.2 because those findings only supported the trial court's conclusion that John was guilty of second degree attempted murder, a conviction that we are reversing.  We address only finding 6.1 because it supported the trial court's conclusion that John had committed second degree assault, a conviction we uphold.

trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence. *Id.*

Sheryl testified in detail that John strangled her to the point of unconsciousness. Photographic evidence, which depicts bruising and discoloration around Sheryl's neck after the attack, corroborated her testimony. The State also presented Sheryl's *Smith*[12] affidavit, which was read into the record and bolstered her version of the events. Expert witnesses also testified that she had neck pain and had suffered a concussion, which one of the State's expert witnesses defined as a "brief loss of consciousness." RP at 442, 445, 488. The aggregate of her testimony, the expert witnesses, and the photographic evidence supply substantial evidence that Sheryl was strangled into unconsciousness.

John raises several arguments challenging this evidence, including that Sheryl wrote her *Smith* affidavit 22 days after the attack, that she had a financial motive to exaggerate her injuries, that she had an alcohol allergy which caused her injuries, and that she was not strangled because of contrary expert testimony and medical evidence in the record. However, these arguments potentially affect only Sheryl's credibility[13] or are merely allegations of contrary evidence. We do not reweigh the credibility of the witnesses or make a different credibility finding than the trial court, as long as the challenged finding is supported by substantial evidence. *Dalton v.*

---

[12] *State v. Smith*, 97 Wn.2d 856, 651 P.2d 207 (1982); *see also* KARL B. TEGLAND, 5B WASH. PRAC.: EVIDENCE LAW AND PRACTICE § 801.21 (6th ed.).

[13] John also contends that the trial court erred in finding Sheryl credible because the record contains "49 counts of perjury." SAG at 18-19. As an initial matter, whether Sheryl committed theft, perjury, fraud, or other offenses are all allegations, and the record does not show whether she in fact was charged with or convicted of any of these crimes. Thus, the trial court considered that claimed evidence properly for what it was: potential impeachment of Sheryl's credibility as related to her financial motive to lie or exaggerate her injuries.

*State*, 130 Wn. App. 653, 667, 124 P.3d 305 (2005). Because there is substantial evidence to support the trial court's finding 6.1 as related to Sheryl's strangulation and loss of consciousness, John's claim fails.

2.      *Brady* Evidence

John next argues that the State suppressed nine pieces of favorable and material evidence that he attached to his SAG, which included parts of medical documents, police reports, a deposition, a letter, and an e-mail. Specifically, he contends that the State put these pieces of evidence on a memory stick and compact disc, but that the technology was unreadable because he did not have the necessary equipment in jail to download the evidence.

In order to demonstrate a *Brady* violation, the defendant has the burden to establish that the evidence at issue (1) was favorable to the defendant because it is exculpatory or impeaching; (2) was willfully or inadvertently suppressed by the State; and (3) was material. *State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015). Even assuming his attached exhibits show a possibility of favorable, material evidence, John's *Brady* claims fail because he does not meet his burden in establishing that the State suppressed these items.

Here, the record supports that when John received the compact disc and memory stick two weeks before trial, he was not provided the necessary equipment to view the evidence contained on them. However, during this time he was pro se for a couple of weeks and the State was in the process of getting him "well over a thousand pages of discovery" in printed form, rather than the unreadable memory stick and compact discs. RP at 47-50. After this short period of pro se status, he decided to be represented by defense counsel again. At a status hearing, John's defense counsel confirmed that John did not have access to the evidence contained on the

memory stick and compact discs while he was pro se and in jail. However, John's defense counsel stated that he would "have access to those materials" and would prepare John's defense with consideration of those materials. RP at 162.

On these facts, John does not meet his burden in showing that the State suppressed any favorable material evidence. The record shows that his defense counsel was ultimately given all of the evidence contained on the memory stick and compact discs. Without any evidence that John continued to lack access to favorable evidence in his case, his *Brady* claims fail.

Furthermore, John has not met his burden to show that the information on the compact discs or memory stick actually contained the allegedly favorable material evidence that he attached in his SAG. Mere allegations are not enough to support a *Brady* claim. If John "wishes a reviewing court to consider matters outside the record, a personal restraint petition is the appropriate vehicle for bringing those matters before the court." *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995). Accordingly, on this record, we hold that his *Brady* claims fail.

3.      Testimony Evidence Related to Sheryl's Financial Motive

John next argues that the trial court abused its discretion in not permitting certain testimony related to Sheryl's financial motive. We disagree.

John first challenges the trial court's decision to sustain the State's objection to a question to John's father, Lawrence Smith.[14] After Lawrence testified that Sheryl was trying to take control of John's patents, defense counsel asked Lawrence *how* he knew this information. The State objected on relevance grounds, which the trial court sustained. We do not find this to be an abuse of discretion. The trial court allowed Lawrence to testify that Sheryl was trying to take

_____

[14] We refer to Lawrence Smith by his first name for clarity. No disrespect is intended.

18

control of John's patents, which would further the defense's purpose in impeaching her credibility. The trial court did not abuse its discretion in ruling that *how* Lawrence knew Sheryl was stealing patents was not relevant to further impeaching her credibility.

John also challenges the trial court's decision to sustain the State's objection to the opinion of one of the defense's witnesses, Guido Bini. Bini was prepared to testify that Sheryl's company, Echosmith, was stealing the business ideas of John's company, Stewardsmith. The defense's offer of proof showed that Bini's knowledge of Echosmith was derived from web sites researched on the internet. Specifically, by comparing the Echosmith and Stewardsmith web sites, he concluded that Sheryl was stealing Stewardsmith's assets. After the defense's offer of proof, the trial court ruled that Bini lacked personal knowledge on the issue and could not testify on the matter. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." ER 602. It was not an abuse of the trial court's discretion to determine that obtaining and comparing information from internet web sites does not constitute personal knowledge of this matter. John's claim that this testimony should have been admitted fails.

4.    Prosecutorial Misconduct

John next argues that the prosecutor improperly disparaged him as a witness when she stated during a pretrial hearing that the attorney general's office was investigating him. To establish prosecutorial misconduct, the defendant must prove that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). To show prejudice, the defendant must "show a substantial likelihood that the misconduct affected the jury verdict." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704,

286 P.3d 673 (2012). Assuming for purposes of argument that the prosecutor's remark was improper, John has not shown that the prosecutor's remark had any effect on the result of the trial. Therefore, he has not shown prosecutorial misconduct.

John further contends that the prosecutor was lying and disparaging him from opening statement to closing argument. However, his contention is not particularized enough to permit its analysis. RAP 10.10(c). Accordingly, this prosecutorial misconduct claim also fails.

5.      Judicial Bias

John next contends that Judge Robert Lewis, who presided over the bench trial, failed to disclose his involvement in a prior case with Sheryl. Specifically, he alleges that Judge Lewis determined that Sheryl was not subject to a special needs trust in a prior case and that the resolution of that prior case made him biased toward her at the bench trial.

Principles of due process, the appearance of fairness doctrine, and the Code of Judicial Conduct require that a judge disqualify him or herself from hearing a case if that judge is biased against a party or if his or her impartiality may be reasonably questioned. *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009). "Before we can find a violation of this doctrine, however, there must be evidence of a judge's actual or potential bias." *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995).

John fails to bring any evidence that Judge Lewis actually presided over the action to change Sheryl's special needs trust to a standard one, if such an action ever took place. With no evidence that Judge Lewis was ever involved in a prior case with Sheryl, his claim for a violation of judicial fairness necessarily fails.

CONCLUSION

We reverse and remand John Smith's second degree attempted murder conviction and affirm his second degree assault conviction.

Bjorgen, C.J.

We concur:

Worswick, J.

Lee, J.